No. 102,254

STATE OF KANSAS, *Appellee*, v. ROBERT MARTIN HABERLEIN, *Appellant*.

(290 P.3d 640)

Opinion filed December 28, 2012.

*Korey A. Kaul,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke,* deputy district attorney, argued the cause, and *Jerome A. Gorman,* district attorney, and *Derek Schmidt,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Robert Martin Haberlein appeals his convictions for first-degree premeditated murder, aggravated kidnapping, and aggravated robbery. He argues: (1) the district judge erred by failing to instruct the jury on second-degree intentional murder; (2) the State failed to present sufficient evidence to prove what he claims are two sets of alternative means of committing aggravated kidnapping; (3) the district judge erred in issuing an instruction on aggravated robbery that was broader than the language in the information; (4) the district judge erred in certifying him as an adult without having a jury make that determination; (5) cumulative error deprived him of a fair trial; and (6) the Kansas hard 50 sentencing scheme is unconstitutional. We affirm.

### FACTUAL AND PROCEDURAL HISTORY

The State charged Robert Martin Haberlein with first-degree murder, premeditated, or, in the alternative, felony murder with the underlying felony of aggravated robbery; aggravated kidnapping; and aggravated robbery, in the November 2005 death of Robin Bell.

Bell was a manager at a Dollar General store in Bonner Springs. On the night of the crimes, Bell's husband woke up about 1 a.m. and discovered that Bell was not home from work. He drove from Tonganoxie to Bonner Springs and arrived at the store about 1:30 a.m. He saw his wife's car still parked at the store and called the police from across the street. Police responded to the scene and located a deceased female, later identified as Bell, in the back room of the store.

Several police officers and crime scene investigators testified about their response to the scene and their subsequent investigation. Officers forced their way into the Dollar General, checked the front of the building, and then exited and re-entered through the back door. Just inside of the back door, officers located the body of Bell with "serious injuries about her head and face" and saw "a tremendous amount of blood on the floor." Bell had suffered severe trauma from "[b]lunt force items," including a step ladder, a tripod, and a shovel, which had "blood all over them."

Officers did not know until a later autopsy that Bell also had been shot, once through her right cheek and once just under the skin on her scalp. An officer who attended the autopsy described Bell's injuries as follows:

"[S]he had a broken finger. She had three broken ribs. Her upper and lower jaw [were] broken. The step stool that went through eye, her eye wasn't there. The cap was recovered from the rear of her skull . . . . She had—she was badly bruised, numerous contusions. She had—the best way I can describe it, he said divots, like little, in her skull from being hit, you know, a little divot. She had several cuts on her face from her—her injuries. We know when she was hit with the tripod, we can correspond the injuries to around her arms because, you know, it's a tripod. And she just—she suffered greatly."

Forensic pathologist Erik Mitchell also testified regarding Bell's injuries. Mitchell noted the "dramatic evidence" of a "tremendous number of physical injuries." Mitchell identified several injuries to Bell's face and head, as well as two gunshot wounds. Bell also had a broken finger on each hand, abrasions and bruises on her legs and arms, and broken ribs. Mitchell identified 48 separate injuries on Bell's body, but he could not tell the order in which they occurred. Bell had two injuries to the brain that would result in death

if not treated, and Mitchell noted other injuries also capable of causing death. Mitchell ultimately said Bell's cause of death was "extensive crush injuries," and he identified the case as a homicide.

At the crime scene, officers also found the cash register drawer in the front of the store open, and it showed an incomplete sale time stamped 20:23:01. A telephone in a back office was pulled out of the wall; a money bag was lying on a desk in the office; and cash drawers were lying on the floor of a safe. Roughly $2,000 was missing from the store.

Officers also observed a bloodstain on the floor of the store and on the inside of the back door leading to the outside. The landing area outside of the door showed more blood. A blood trail led from the back door toward the rear of a Goodwill Store to the north.

The State called Detective Victoria Fogarty of the Bonner Springs Police Department as a witness about the investigation. In September 2007, Fogarty was still working on the case when she received a report about a runaway named Christa Lewis. Haberlein called the police station to talk about the report and said that Lewis was his girlfriend. Lewis and Haberlein then came to the police station.

Lewis, who was 18 years old at the time of Haberlein's trial, testified about her relationship with Haberlein and her knowledge of the robbery. She was friends with Haberlein, John Backus, and A.R. during high school. Lewis testified that the four talked about the robbery for a few days before it happened and that she participated in the search for a place to rob. Lewis did not end up going to the Dollar General with her friends, but she gave the three others the keys to another friend's car for use in the robbery. The three came back to Lewis' house the day after the crimes to watch the news for a story about the robbery and murder. Backus and Haberlein threatened Lewis and said they would hurt her if she told anyone. Lewis also got money from Backus a few days later in exchange for providing the car.

When Lewis and Haberlein came to the police station, another officer initially spoke with Haberlein but then requested assistance from Fogarty. After being read his *Miranda* rights, Haberlein brought up the Bell homicide. Haberlein initially said that he acted

only as a lookout and implicated others, but the police recognized that Haberlein shared details of the crime that had not been released to the public.

The officers took Haberlein to the Kansas City Police Department to videotape a formal statement. After the statement, Haberlein was transported to Wyandotte County Detention Center, where he was held while officers spent several days attempting to corroborate Haberlein's original account of the events. Officers then interviewed Haberlein again, and he began to change his story.

After interviewing Haberlein, officers contacted A.R., who had been Haberlein's 15-year-old girlfriend at the time of the crime. When A.R. and her parents arrived at the police station, officers told them that they were attempting to get background information on Haberlein. After about 20 minutes, Fogarty spoke with A.R. alone. A.R. explained that she was at the Dollar General at the time of the crimes, and Fogarty read A.R. her *Miranda* rights. Fogarty later said that A.R. acted afraid and said she had been told by Backus and Haberlein that she would get hurt if she revealed what she knew. After A.R. talked about her version of what happened in the store, officers took her to the crime scene, and then to the Kansas City Police Department for a videotaped statement. She also was placed in detention.

After A.R.'s interview, officers arrested Backus and took him to jail. At that point, they returned to Haberlein for another interview. Again, Haberlein changed his previous story and implicated Backus and A.R.

A.R. ultimately testified against Haberlein in exchange for prosecution as a juvenile. She said that she first met Haberlein in the ninth grade, and eventually the two became a couple. Before that, she had dated Backus, who also knew Haberlein. A.R. was also friends with Lewis. About the time of the crime, Haberlein was living with A.R.'s family. She, Haberlein, and Backus went to Lewis' house to plan the robbery, which was motivated by A.R.'s knowledge of her family's financial problems. The four looked for a business in Bonner Springs that would be easy to rob and decided on the Dollar General. On the night of the crime, A.R., Haberlein,

and Backus went to Lewis' house. Lewis decided not to go with them, but the three were able to obtain keys to a car.

According to A.R., when she, Haberlein, and Backus arrived in a parking lot near Dollar General, Haberlein told her: "[T]here's something more serious that's about to happen, and if you tell anybody, I'm going to kill you." A.R. was aware that Haberlein had a gun.

Once inside the store, A.R. and Haberlein pretended to shop while Backus positioned himself near the back. When A.R. and Haberlein took the items they had collected to a cash register at the front of the store, Haberlein pulled out a gun, pointed it at Bell's forehead, and told her to give him all the money from the register. Bell started to give Haberlein the money, but he went behind the register, put Bell's hands behind her back, and took her to the back of the store. A.R. saw Backus follow Haberlein and Bell to a back office.

A.R. was standing by the front counter when she heard screams and two or three gunshots. She ran to the back and saw Bell standing in front of a safe with Haberlein pointing a gun at her and telling her to open it. Bell had been shot and was bleeding, but she opened the safe and put the money in a bag. Haberlein handed the money to Backus, and Backus put the money by the inside door. Bell then ran out of the store through its back door. Haberlein and Backus chased her, and A.R. held the door open for them as they pulled Bell back inside. Bell asked A.R. for help, but A.R. said she could not help.

Haberlein and Backus then took Bell to a storage room, pushed her to the ground, and started beating her with things from the room. Backus beat her with a broom, and Haberlein beat her with a bucket, stuck a chair leg through her face, and beat her with a stool. A.R. stood silent in the doorway while the beating continued for what she estimated to be up to 10 minutes. Bell stopped moving when she was shot again by Haberlein.

Backus or Haberlein then tried to clean up the area in the storage room. Backus picked up the money, and the three went out the store's back door and returned to the car. Backus or Haberlein

put the money in the trunk; Haberlein threw the gun on the floor of the back seat; and the three drove to a McDonald's to eat.

The three then went to Backus' house, where Backus and Haberlein changed clothes. They put their old clothes in the trunk of the car, and they dropped the car back off at Lewis' house. Haberlein and A.R. went to her house with the clothes and money. A.R. told her mother, Yvette, about the robbery the next day, and Yvette drove her daughter and Haberlein to a bridge to dump the gun. According to A.R., the money from the robbery went to her mother. A.R. said she and Haberlein burned the bloody clothes.

Yvette's testimony at Haberlein's trial corroborated her daughter's testimony in part. On the morning after the crimes, Backus and Haberlein came to her house. Yvette overheard them talking about the robbery with her daughter and thought they were joking because Haberlein was laughing. Yvette followed her daughter into her bedroom, and A.R. showed her mother Haberlein's gun. Yvette admitted that she knew the gun was the murder weapon. She did not want it in the house and went with her daughter to dispose of it. When Yvette took the gun out of the trunk, she said, she found a bag of bloody clothes as well. Yvette said she threw it all over the side of a bridge because she was "trying to protect" her daughter. Yvette said she received $400 from her daughter for helping to get rid of the gun. Yvette did not tell the police of her involvement until after her daughter gave her account of the crimes to the police. Yvette pleaded guilty to aiding a felon and received 18 months' probation in exchange for her testimony.

A.W., a friend of A.R.'s who was 16 years old at the time of trial, testified that A.R. told her about a woman who had been killed in Bonner Springs. A.W. also testified that A.R. admitted involvement in the crimes, and said Haberlein and his best friend also were involved.

No physical evidence from the crime scene tied Haberlein to the crime, and the murder weapon was not introduced into evidence. Letters that Haberlein allegedly sent to two other jail inmates were admitted into evidence. The State also introduced and played for the jury three videotaped statements made by Haberlein and one by A.R.

The defense called Haberlein as its sole witness. Haberlein testified that he was at his mother's house on the day of the crimes. He also said that he had been taking cocaine and was off his prescribed medication for mental problems when he spoke with Fogarty for the first time. Haberlein said that he received information about the details of the crime from Fogarty and was still under the influence of cocaine and was given more details of the crime when he gave his first videotaped statement.

During his interview with officers a few days later, Haberlein said, he explained that he was still recovering from his drug use and was still off of his prescribed medication. Haberlein said he told the police what he did because he was trying to protect A.R. and her mother. Haberlein acknowledged that he wrote a letter discussing the crime while in jail, but he said that some of the content was untrue. Haberlein said he did not meet A.R. until after the robbery and did not move in with A.R.'s family until January 2006, when A.R. told him that she had participated in the crimes. Haberlein denied any involvement in the Dollar General robbery and Bell's murder.

Haberlein did not seek a lesser included offense instruction on second-degree intentional murder. He had been charged with aggravated kidnapping under K.S.A. 21-3421. The statute provides: "Aggravated kidnapping is kidnapping, as defined in K.S.A. 21-3420 and amendments thereto, when bodily harm is inflicted upon the person kidnapped." K.S.A. 21-3420 provides:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:

"(a) For ransom, or as a shield or hostage;

"(b) to facilitate flight or the commission of any crime;

"(c) to inflict bodily injury or to terrorize the victim or another; or

"(d) to interfere with the performance of any governmental or political function."

The district judge instructed the jury:

"The defendant is charged in Count II with the crime of Aggravated Kidnapping. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant, or another for whose conduct he was criminally responsible, took or confined Robin Bell by force, threat or deception;

"2. That it was done with the intent to hold such person to facilitate flight or the commission of any crime, to-wit: Aggravated Robbery;

"3. That bodily harm was inflicted upon Robin Bell; and

"4. That this act occurred on or about the 11th day of November, 2005, in Wyandotte County, Kansas."

The jury convicted Haberlein of first-degree premeditated murder, aggravated kidnapping, and aggravated robbery.

Haberlein filed two unsuccessful motions for new trial. Haberlein received a hard 50 sentence for the first-degree premeditated murder conviction, a 253-month sentence for the aggravated kidnapping conviction, and a 59-month sentence for the aggravated robbery conviction. All of the sentences were ordered to run consecutively.

### FAILURE TO INSTRUCT ON SECOND-DEGREE MURDER

Haberlein did not object to the district judge's failure to give an instruction on the lesser included offense of second-degree intentional murder. He now argues that the failure to give the instruction was clearly erroneous.

This court has recently clarified the analytical steps and corresponding standards of review for jury instruction issues on appeal:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

Thus, to determine whether it was clearly erroneous to fail to give an instruction, the reviewing court necessarily has to first determine whether it was erroneous at all. Only after determining that the district judge erred in failing to give a particular instruction

does a reviewing court engage in a reversibility inquiry. During this reversibility portion of the analysis, the burden to show clear error under K.S.A. 22-3414(3) remains on the defendant. *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 286 P.3d 195 (2012).

K.S.A. 21-3401(a) defines first-degree premeditated murder as the killing of a human being committed intentionally and with premeditation. In contrast, second-degree intentional murder is the killing of a human being committed intentionally; no premeditation is required. K.S.A. 21-3402(a). The instruction about which Haberlein complains would have been legally appropriate here, because second-degree intentional murder is a lesser included offense of first-degree premeditated murder. See *State v. Scaife*, 286 Kan. 614, 620-23, 186 P.3d 755 (2008).

The next question the court must consider is whether the instruction for second-degree intentional murder would have been factually supported on the record before us. *Plummer*, 295 Kan. 156, Syl. ¶ 1. While the evidence of premeditation in this case was extremely strong, there also was at least some evidence of each of the other elements of first-degree premeditated murder, and these elements are identical to the elements of second-degree intentional murder. Thus, at least in theory, the jury could have chosen to convict Haberlein of second-degree intentional murder without having its verdict subject to reversal for insufficient evidence. This means the instruction was factually supported.

Because the second-degree intentional murder instruction was factually and legally supported, it was error for the district judge not to give it. See K.S.A. 22-3414(3) (judge shall give instruction on lesser included crime when some evidence would reasonably justify conviction).

But our determination that the omission of this instruction was erroneous does not answer the question of whether the failure to give the unrequested instruction was clearly erroneous. Haberlein bears the burden of firmly convincing us that the jury would have convicted him of second-degree intentional murder rather than first-degree premeditated murder had the error not occurred. *Plummer*, 295 Kan. 156, Syl. ¶ 1 (citing *State v. Ward*, 292 Kan. at 565).

Haberlein argues that "[a]lthough premeditation can happen in a very short amount of time, a reasonable juror could require a longer time" and "there is a real possibility the jurors in this case would have had a more expanded definition of premeditation." The State responds that the evidence at trial excluded Haberlein's position and that no jury could have reasonably convicted Haberlein of second-degree intentional murder.

This court has explained premeditation as follows:

" ' "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." ' *State v. Martis*, 277 Kan. 267, 301, 83 P.3d 1216 (2004) (quoting *State v. Hebert*, 277 Kan. 61, 88, 82 P.3d 470 [2004]). Several factors may give rise to an inference of premeditation, including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *State v. Scott*, 271 Kan. 103, 109, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001). Moreover, premeditation and deliberation may be inferred from the established circumstances of a case, provided the inference is a reasonable one. *State v. Scott*, 271 Kan. at 108; see also *State v. Jones*, 279 Kan. 395, 404, 109 P.3d 1158 (2005)." *State v. Morton*, 283 Kan. 464, 474-75, 153 P.3d 532 (2007).

Haberlein's jury was given the following definition: "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

The evidence of premeditation in this case was peculiarly abundant. It is rare for there to be testimony that an armed defendant announced before a planned robbery that "something more serious was about to happen." A.R. also testified that Bell had been shot and was bleeding by the time she reached the back office. After the safe was emptied, when Bell momentarily escaped, Haberlein and Backus chased after her, caught her, and forced her back inside the store. Bell's request for help from A.R. was in vain. Instead, Haberlein and Backus subjected Bell to a merciless and prolonged

beating, converting several objects to weapons, and then again shot Bell. Finally, she stopped moving. She had 48 separate injuries. On this grisly record, and in light of Haberlein's shifting stories and trial defense of categorical denial, we are not firmly convinced there was a real possibility the jury would have convicted him of second-degree intentional murder, had it been given that option. The district judge's failure to instruct *sua sponte* on second-degree intentional murder was not clearly erroneous.

### ALTERNATIVE MEANS OF AGGRAVATED KIDNAPPING

Haberlein's second claim on appeal challenges his aggravated kidnapping conviction on the ground that the evidence was insufficient to support a finding of guilt on each of the alternative means for committing the crime on which the jury was instructed. Our recent decision in *State v. Brown*, 295 Kan. 181, 284 P.3d 977 (2012), established a framework for considering whether statutory language creates alternative means demanding independently sufficient proof beyond a reasonable doubt. The first step to determine whether use of an "or" in a statute separates alternative means requires interpretation or construction. *Brown*, 295 Kan. 181, Syl. ¶ 4. Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal. See *State v. Burnett*, 293 Kan. 840, 847, 270 P.3d 1115 (2012); see also *State v. Kesselring*, 279 Kan. 671, 678, 112 P.3d 175 (2005) (court exercises de novo review over jury unanimity issues). Only if statutory language is ambiguous do we move from interpretation to construction and rely on any revealing legislative history or background considerations that speak to legislative purpose, as well as the effects of application of the canons of statutory construction. See *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271-72, 202 P.3d 7 (2009).

In *Brown*, we set the following guideposts to determine whether a statute sets out alternative means:

"In examining legislative intent, a court must determine for each statute what the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea*,

*actus reus,* and, in some statutes, a causation element? Or is it to merely describe a material element or a factual circumstance that would prove the crime? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction. See [*State v. Wright,* 290 Kan. 194, 201, 224 P.3d 1159 (2010)] ('[*State v. Timley,* 255 Kan. 286, 875 P.2d 242 (1994)] required sufficiency of evidence to support each alternative means *upon which a jury is instructed,* in order to protect a criminal defendant's right to a unanimous jury verdict.' [Emphasis added.]); see also [*State v. Peterson,* 168 Wash. 2d 763, 769, 230 P.3d 588 (2010)] (focus of the alternative means rule is on the jury instructions)." 295 Kan. at 194.

We noted in *Brown* that the legislature will typically signal its intent to state alternative means through structure, separating intended alternatives into distinct subsections. The legislature also may list additional alternatives or options within one alternative means of committing the crime. "But these options within an alternative do not constitute further alternative means themselves if they do not state additional and distinct ways of committing the crime, that is, if they do not require proof of at least one additional and distinct material element," *i.e., mens rea, actus reus,* or causation. *Brown,* 295 Kan. at 196.

"An option within a means scenario is another important clue to legislative intent because such options signal secondary status rather than an intent to create a material, distinct element of the crime. Options within a means—that is, the existence of options that do not state a material, distinct element—do not demand application of the super-sufficiency requirement. [Citations omitted.]." *Brown,* 295 Kan. at 197.

Haberlein argues that force, threat, and deception are alternative means of committing the crime of aggravated kidnapping, that each was instructed upon, and that there was no evidence to support deception. He also argues that facilitation of flight and facilitation of the commission of the crime of aggravated robbery are alternative means that were instructed upon and that there was no evidence supporting the intention to hold Bell to facilitate the perpetrators' flight.

In its brief, submitted well before *Brown* was filed, the State conceded that force, threat, and deception were alternative means but argued that there was sufficient evidence to support each. In the State's view, Haberlein "deceived" Bell when he pretended to shop and approached the register in "order to get close enough to her to hold and confine her." The State met Haberlein's argument on flight and commission in the same fashion, arguing there was sufficient evidence that the holding of Bell facilitated flight in that "the continued confinement (and eventual murder) of [Bell] in the back room after she begged for her life substantially lessened [Haberlein's] risk of detection or made it easier for [him and Backus and A.R.] to escape without a single witness to identify them." Because *Brown* has intervened, we must analyze whether the governing statutory language and the jury instruction that repeated it actually created two sets of alternative means. In other words, the State's concessions may have been premature.

*Force, Threat, or Deception*

Haberlein does not challenge the phrase "taking or confining" in this appeal. Those two terms set out two alternative means of carrying out the crime of kidnapping and thus aggravated kidnapping. "Taking" and "confining" each denotes a distinct *actus reus* and they are, therefore, alternative means. But the phrase "force, threat, or deception" addresses secondary matter, merely describing ways in which the *actus reus* can be accomplished. In other words, under our *Brown* analysis, each is an option within the means of taking or confining. Each merely sets out factual circumstances that may prove the distinct, material element of taking or confining. Force, threat, and deception are not alternative means of committing a kidnapping or aggravated kidnapping, and we need not reach the question of whether sufficient proof of each was presented to Haberlein's jury. See *Brown*, 295 Kan. 181, Syl. ¶ 11; *cf. State v. Wright*, 290 Kan. 194, 207, 224 P.3d 1159 (2010); *State v. Timley*, 255 Kan. 286, 290, 875 P.3d 242 (1994).

*Facilitation of Flight or Facilitation of Commission of Aggravated Robbery*

Haberlein next points to the following language in subsection (b) of K.S.A. 21-3420: "to facilitate flight or the commission of any crime." When we examine the language of the entire statute, it appears the legislature did signal through structure an intent to define alternative means of proving the *mens rea* for kidnapping and aggravated kidnapping. It did not stop with "intent to hold" but listed several motivations for that intent to hold. Each of the subsections that follows states an additional and distinct way of committing the crime, and proof of one of these additional and distinct material elements must be shown in order to support a conviction. Thus, the different subsections create alternative means of committing a kidnapping.

But the language on which Haberlein relies is *within* subsection (b). Facilitation of flight and facilitation of the commission of a crime are mere options within a means. The members of the legislature grouped certain potentially distinct and potentially overlapping items, which must mean they did not want jurors to have to split hairs over whether a kidnapping or aggravated kidnapping was committed to facilitate flight or the commission of any crime. Again, we need not reach the question of whether the evidence was sufficient on each.

Accordingly, Haberlein is thus not entitled to reversal of his aggravated kidnapping conviction. This was not an alternative means case on either of the bases he asserts.

### AGGRAVATED ROBBERY INSTRUCTION

Count III of the information charged Haberlein with aggravated robbery as follows:

"[O]n or about November 11th, 2005, defendant John William Backus, Robert Haberlein, and another did unlawfully, feloniously and willfully take property, to-wit: money, *from the presence* of another, to-wit: Robin Bell, by force, while the said John William Backus was armed with a dangerous weapon, to-wit: handgun, in violation of K.S.A. 21-3427." (Emphasis added.)

At Haberlein's trial, in contrast, the jury was instructed:

"The defendant is charged in Count III with the crime of Aggravated Robbery. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant, or another for whose conduct he was criminally responsible, intentionally took property, to-wit: money, *from the person or presence* of Robin Bell;

"2. That the taking was by force;

"3. That the defendant, or another for whose conduct he was criminally responsible, was armed with a dangerous weapon, to-wit: a handgun OR inflicted bodily harm upon Robin Bell in the course of such conduct; and

"4. That this act occurred on or about the 11th day of November, 2005, in Wyandotte County, Kansas." (Emphasis added.)

Haberlein did not object to the giving of this instruction at trial, but he now argues that it was impermissibly broader than the language in the information. He thus claims his conviction must be vacated. As explained in relation to the lesser included offense instruction discussed above, on appeal, Haberlein must demonstrate that the aggravated robbery instruction he challenges for the first time on appeal was clearly erroneous; *i.e.*, he must firmly convince us that the jury would have reached a different verdict if it had been instructed as he now insists it should have been. See *Plummer*, 295 Kan. 156, Syl. ¶ 1.

It appears that this issue, as set out in Haberlein's brief, raised two distinct objections: The instruction should not have included "the person" in the phrase "from the person or presence," and it should not have included "OR inflicted bodily harm." Haberlein asserted that "[h]ad the district court properly instructed the jury, there is a real possibility the verdict would have been different" because the evidence indicated "that [Haberlein] took the bag from the person of Robin, not merely in her presence." Haberlein did not likewise elaborate on how the inclusion of "OR inflicted bodily harm" was reversible error, and we therefore will not address that objection.

With regard to the "person or presence" objection, the State concedes that instructions generally should not be broader than the charges contained in the information. The State is bound by the wording of its complaint and limits itself to pursue only that "version of the offense" or "theory" of the case at trial. *State v.*

*Trautloff*, 289 Kan. 793, 802-03, 217 P.3d 15 (2009). A defendant must be informed of the nature of the accusation against him or her and "the prosecution and the court must exercise caution in conforming jury instructions to the charges." *State v. Jones*, 290 Kan. 373, 384, 228 P.3d 394 (2010); see also *Trautloff*, 289 Kan. at 802 (citing *Russell v. United States*, 369 U.S. 749, 767, 770, 82 S. Ct. 1038, 8 L. Ed. 2d 240 [1962]); *State v. Wade*, 284 Kan. 527, Syl. ¶ 3, 161 P.3d 704 (2007); *State v. Hemby*, 264 Kan. 542, 548, 957 P.2d 428 (1998); *State v. Booker*, 197 Kan. 13, 15, 415 P.2d 411 (1966).

The State nevertheless contends that this rule does not apply here because the questioned jury instruction, although different from the information, was no broader. A taking from Bell's person necessarily also constituted a taking from her presence. Thus the addition of that word in the instruction added nothing not already covered in the information. We agree. See *State v. Robinson*, 27 Kan. App. 2d 724, 728, 8 P.3d 51 (2000) ("Personal property can be taken from a victim's 'presence' without being taken from his or her 'person,' but it cannot be taken from his or her 'person' without being taken in his or her 'presence.' "); see also *Walker v. State*, No. 105,373, 2012 WL 1237890, at *2 (Kan. App. 2012) (unpublished opinion) (citing *State v. Verge*, No. 92,562, 2005 WL 2076503, at *3 [Kan. App. 2005] [unpublished opinion], *rev. denied* 280 Kan. 991 [2005]) (taking from victim's person necessitates taking from victim's presence). Because the information required the jury to find that Haberlein took money from the presence of Bell, the broader concept, it also permitted the jury to find that Haberlein took money from the person or presence of Bell, the narrower concept. The inclusion of both concepts in the instruction was neither factually nor legally erroneous and thus not clearly erroneous.

## ADULT CERTIFICATION

Haberlein claims, for the first time on appeal, that the decision to authorize adult prosecution substantially increased the maximum penalty he faced, and he was therefore entitled to have a jury make the determination rather than a district judge, citing *Ap-*

*prendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Constitutional grounds for reversal asserted for the first time on appeal are not properly before us for review. *State v. Perez*, 292 Kan. 785, 789, 261 P.3d 532 (2011). Haberlein provides no explanation as to why we should apply cited exceptions recognized by caselaw, and we therefore decline to do so. See *Perez*, 292 Kan. at 789 (declining to reach defendant's same argument under the same circumstances); *State v. Kunellis*, 276 Kan. 461, 465, 78 P.3d 776 (2003).

### CUMULATIVE ERROR

Haberlein asserts that the cumulative error doctrine necessitates reversal, but we detect only one error—the failure to give a lesser included offense instruction. One error cannot support application of the doctrine. See *State v. Miller*, 293 Kan. 535, 582, 264 P.3d 461 (2011) (citing *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 [2009]).

### CONSTITUTIONALITY OF HARD 50 SENTENCING SCHEME

Following the jury verdict, the district judge sentenced Haberlein to the enhanced hard 50 life sentence, plus 312 months for the other offenses. Haberlein did not object to the constitutionality of the hard 50 sentencing scheme below, but he now argues that it is unconstitutional because it imposes additional punishment, a minimum of 50 years in prison rather than 25 years, based on factors not submitted to the jury and proven beyond a reasonable doubt. Again, we will not consider the merits of the argument because Haberlein provides no explanation of why the issue should be considered for the first time on appeal. See *Perez*, 292 Kan. at 789.

### CONCLUSION

We conclude that defendant Robert Martin Haberlein has pursued only one meritorious appellate argument: that the district judge should have given a jury instruction on the lesser included offense of second-degree intentional murder. His failure to object or otherwise call the judge's attention to this error in the district

court places upon him a burden he cannot bear. We are not firmly convinced that the instruction would have affected the verdict. The judgment of the district court is therefore affirmed.

\* \* \*

ROSEN, J., concurring in part and dissenting in part: I agree with the majority's well-reasoned conclusions affirming Haberlein's convictions. However, I respectfully dissent from the majority opinion which finds error by concluding that the record demonstrates an obligation to instruct the jury on second-degree murder. K.S.A. 22-3414(3) provides "where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime." Even viewing the evidence in the light most favorable to Haberlein, I cannot agree that we are required to speculate as to whether the evidence in this case would reasonably justify a conviction of the lesser included crime. As the majority so vividly describes:

"The evidence of premeditation in this case was peculiarly abundant. It is rare for there to be testimony that an armed defendant announced before a planned robbery that 'something more serious was about to happen.' A.R. also testified that Bell had been shot and was bleeding by the time she reached the back office. After the safe was emptied, when Bell momentarily escaped, Haberlein and Backus chased after her, caught her, and forced her back inside the store. Bell's request for help from A.R. was in vain. Instead, Haberlein and Backus subjected Bell to a merciless and prolonged beating, converting several objects to weapons, and then again shot Bell. Finally, she stopped moving. She had 48 separate injuries." *Haberlein*, slip op. at 14.

The difference between first-degree murder and second-degree murder is premeditation. As the majority points out, a jury may reasonably infer premeditation from the circumstances of a case. *State v. Morton*, 283 Kan. 464, 475, 153 P.3d 532 (2007). And I agree with the majority's conclusion that the circumstances of this case could lead the jury to reasonably infer that the crime was premeditated.

I disagree with the majority's conclusion, however, that an instruction on second-degree murder was required based on the facts of this case. Haberlein did not request nor did he object to the trial

court's omission of an instruction on second-degree intentional murder. Here, the majority simply concludes that

"[w]hile the evidence of premeditation in this case was extremely strong, there also was at least some evidence of each of the other elements of first-degree premeditated murder, and these elements are identical to the elements of second-degree intentional murder. Thus, at least in theory, the jury could have chosen to convict Haberlein of second-degree intentional murder without having its verdict subject to reversal for insufficient evidence. This means the instruction was factually supported." *Haberlein,* slip op. at 12-13.

The test set forth in K.S.A. 22-3414(3) is not a theoretical one. Instead, it requires the trial judge, who has heard the evidence in the case, to determine whether there is "some evidence which would *reasonably justify a conviction*" of the lesser included crime. (Emphasis added.) If our test is to find in "theory" whether the facts support a lesser included crime, any scenario limited only by one's imagination would suffice in making the determination on whether to instruct. It seems to me by employing such a standard we are mandating that in all cases where the facts support a charge of premeditated first-degree murder, the trial court is now required to instruct on all lesser included instructions. In short, the majority position would require the court to give weight to ephemeral evidence—or nonevidence—and to apply it to any speculative scenario that the facts of the case may provide in order to reach the far-fetched conclusion that the crime was not premeditated. That is not the law in this state, and it should not become the law of this state.

I would simply find on this record and consistent with my dissenting opinions in *State v. Tahah,* 293 Kan. 267, 262 P.3d 1045 (2011), and *State v. Scaife,* 286 Kan. 614, 186 P.3d 755 (2008), that it was not error for the trial court to not instruct the jury on second-degree murder.