NOT DESIGNATED FOR PUBLICATION

No. 113,486

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TODD J. LLOYD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed November 4, 2016. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., SCHROEDER, J., and WALKER, S.J.

*Per Curiam*:  Todd J. Lloyd appeals his conviction at jury trial of kidnapping his girlfriend as he attempted to avoid arrest on a warrant. Because we find no errors requiring reversal, the conviction is affirmed.

FACTS

On the day of the incident, Lloyd's Intensive Supervision Officer, Don Wilkins, issued an Arrest and Detain Order for probation violation and requested a police officer to accompany him to Lloyd's residence to make the arrest. Sergeant Eric Buller

1

responded. When Wilkins and Buller arrived at the residence, they saw Lloyd in the front doorway. Lloyd quickly closed the door, and Wilkins saw him leave the residence through a back door with his girlfriend, Jennifer Hartman.

Needing help to apprehend them, Buller called for backup and Sergeant Josh Radloff arrived and reported he had seen a man and woman walking as he was driving to the scene. When Buller sighted them, he told them to stop because Lloyd was under arrest. Lloyd and Hartman turned around to face Buller, and Buller testified that Lloyd moved behind Hartman and "grabbed her with one hand, or one arm" and yelled something at him, which he initially thought was that Lloyd had a gun, but Lloyd then said he had a knife and would cut or kill Hartman. It appeared to Buller that throughout the encounter Lloyd was guiding Hartman from behind and that he was holding her by her shoulder or arm so that she was always between him and Lloyd. On cross-examination, Buller stated that Hartman was not pulling away from Lloyd to try to get away. Radloff testified that when he first saw Lloyd and Hartman, they were holding hands or that Lloyd was holding Hartman above the wrist and it appeared that Lloyd was pulling her more than just holding hands. Radloff saw them have a conversation in the street, and Lloyd then addressed the officers, asking if they could try to "resolve this."

Believing that Hartman was a hostage in danger of Lloyd's knife, Sergeant Buller pulled his gun and Sergeant Radloff arrived with his rifle. Buller testified it was the closest he had ever come to shooting someone, but he could not take a shot because of the risk of hitting Hartman. Radloff ordered Hartman to drop to the ground and after she did, Lloyd let go of the knife. Lloyd was ordered to drop to the ground and as he did, Buller saw him crouch down and then move toward Radloff. Believing it to be an aggressive move, Radloff fired his taser at Lloyd. After determining that Lloyd had not been effectively tased, Buller jumped on Lloyd and a struggle ensued as he tried to handcuff him. Radloff struck Lloyd several times in the back with the end of the taser to "gain pain compliance." Each time the taser hit Lloyd, it completed the electrical circuit and tased

2

him. Buller saw him stiffen up and heard him make a moaning noise each time. Buller believed Lloyd was reaching for the rifle, so he pinned Lloyd's upper body to the ground and delivered a knee strike to the left side of his face. That did not calm Lloyd down completely, but "[h]e was a lot less interested in continuing" the struggle.

Wilkins testified that after Lloyd voluntarily got down to the ground, the officers then approached and may have ordered him to lay flat and an officer kicked him in the back to get him flat on the ground. He also testified that it was not until that point that Lloyd began resisting physically and that he wrestled with an officer.

Lloyd was charged with alternative charges of kidnapping pursuant to K.S.A. 2015 Supp. 21-5408(a)(1) (kidnapping with the intent to hold the victim "as a shield or hostage") and (a)(2) (kidnapping with the intent to hold the victim "to facilitate flight"). After a 3-day trial, the jury returned a guilty verdict on both counts, and Lloyd was subsequently sentenced to 221 months' imprisonment. He has filed this timely appeal from his conviction.

ANALYSIS

As his first issue on appeal, Lloyd challenges the sufficiency of the evidence to prove kidnapping by "taking" and "confining." When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). When a statute presents alternative means for committing a crime, a sufficiency of the evidence review must be conducted as to each means. See *State v. Foster*, 298 Kan. 348, 352, 312 P.3d 364 (2013).

3

Our Supreme Court has defined taking and confining as alternative means of committing the crime of kidnapping because each is a distinct *actus reus*. *State v. Haberlein*, 296 Kan. 195, 208, 290 P.3d 640 (2012). In an alternative means case, there must be jury unanimity as to guilt for the single crime charged; however, unanimity is not required as to the means by which the crime was committed so long as substantial evidence supports each of the alternative means. *Foster*, 298 Kan. at 352. In determining whether there is sufficient evidence to support a conviction, an appellate court generally will not reweigh the evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

The elements of kidnapping that Lloyd was charged with are, in relevant part: the taking or confining of any person, accomplished by force or threat, with the intent to hold such person as a shield or hostage, or to facilitate flight. See K.S.A. 2015 Supp. 21-5408(a)(1) and (a)(2). There was no argument regarding the elements of "shield or hostage" or "facilitate flight" and, although the prosecutor argued "by deception" in the closing argument, there was no evidence adduced on that factor. None was necessary, because the terms "force, fear, or deception" are not alternative means; they simply describe ways that the *actus reus* of taking or confining can be accomplished, so the State need prove only one of these three ways. See *Foster*, 298 Kan. at 352.

Lloyd argues there was no taking and that he did not use force or threat against Hartman. He consistently contended throughout the trial and on appeal that there was no kidnapping because Hartman went with him willingly. At trial, his counsel sought to have "against her will" inserted into the jury instructions defining kidnapping. Counsel stated, "[I]t is the intent of the law and common sense suggests any kidnapping has to be done against somebody's will." The State countered that "against her will" is not an element in the statute. The district court ruled against Lloyd and used the PIK instruction on kidnapping without alteration, noting that Lloyd had preserved the issue for appeal.

4

Lloyd continues to argue that kidnapping cannot occur unless the action is against the will of the victim. He cites *State v. Burden*, 275 Kan. 934, 69 P.3d 1120 (2003), where the Kansas Supreme Court quoted from *State v. Brown*, 181 Kan. 375, 312 P.2d 832 (1957). "Kidnap" has a recognized meaning: "Both under the common law and under a statute, unless clearly modified, it means to take and carry away any person by unlawful force or by fraud, and against his [or her] will." 181 Kan. at 388. The statute in effect at the time of *Brown*, G.S. 1949, 21-449, included the phrase "against his [or her] will," but that phrase is not present in the current statute. See K.S.A. 2015 Supp. 21-5408. When the legislature revises a law, the court presumes that the legislature intended to change the law as it existed prior to the amendment. *State v. Snellings*, 294 Kan. 149, 157, 273 P.3d 739 (2012). Thus, we will not read into the law a requirement that the action be "against his [or her] will."

To show that Lloyd did not use force or threat to keep Hartman with him, Lloyd cites Hartman's testimony that she was not afraid of him, had never been afraid of him, had never been hurt by him, and had not been forced or threatened to go along with him on the day of his arrest. She testified that Lloyd told her the police were going to shoot him that day and she went with him because thought she could do something to prevent that. Lloyd also points to the testimony of Sergeant Buller on cross-examination where he stated that the police audio system recorded Buller telling Sergeant Radloff that Hartman said she was more afraid for Lloyd's safety than she was for herself.

The State points to the testimony of the officers to show that Lloyd took Hartman by force or threat. Sergeant Buller testified, "At various times during the event [Lloyd] had the knife, not, not at her throat but up like in this general area [the side of the head]." He further testified that at times, Lloyd had the knife down by her side or behind her.

To reach its verdict of guilty, the jury necessarily discredited Hartman's testimony that she accompanied Lloyd willingly. Viewed in the light most favorable to the State,

5

these facts provide sufficient evidence for a jury to conclude that Lloyd was using Hartman as a shield or hostage, by force or threat, despite her testimony that she went willingly with Lloyd and it was her intention to place herself between Lloyd and the police so they could not shoot him. In sum, the State has met its burden of showing that there was a taking of Hartman by Lloyd.

Whether the State has shown that confining occurred is a much closer question in this case. Statutory interpretation is a question of law over which this court has unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The primary question we face is whether a victim can be confined when walking with the defendant outdoors as opposed to being confined within a room (or other defined area) and whether the act of holding someone by the arm or hand can constitute confinement.

We start with the general interpretation given to the kidnapping statute, K.S.A. 21-3420, by our Supreme Court. "Under that statute it is the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping." *Burden*, 275 Kan. at 943. This definition refers to a *place* of confinement, which could arguably require a space enclosed in some way by walls or other defined boundaries.

There is no statutory definition of the words "confine" or "confinement," and we have searched in vain for a Kansas appellate court decision that would provide a helpful definition of confining in the specific context of kidnapping in this case. Black's Law Dictionary 340 (9th ed. 2009) defines confinement as "[t]he act of imprisoning or restraining someone." The definition cited by Lloyd is "'to hold within a location; . . . imprison.'"

The absence of a statutory definition causes us to believe that a jury would be expected to use a nontechnical definition of the word confine which is rooted in common

6

parlance and usage. Such a broader and more colloquial definition can be found in the Webster's II New College Dictionary 236 (1995), which refers to confine as "[t]o keep within bounds . . . [t]o keep shut up"; and most pertinently for our understanding as "[t]o restrain in movement."

This parade of definitions brings us back to the question of whether moving around outside in the presence of police officers qualifies as confinement. See, *e.g.*, *State v. Ramirez*, 299 Kan. 224, 231-32, 328 P.3d 1075 (2014) (discussing criminal restraint as a lesser included offense of kidnapping and their common origin in common-law false imprisonment; quoting Wharton's Criminal Law treatise that defines common-law false imprisonment as "'when a defendant so restrains another person as to interfere substantially with his [or her] liberty'").

Where the issue does arise, most Kansas cases have typically explored confinement in the context of the "facilitation of a crime" element and whether kidnapping is properly charged as a separate offense in addition to the offense of rape or robbery. See, *e.g.*, *State v. Kemp*, 30 Kan. App. 2d 657, 660, 46 P.3d 31 (2002) (victim was "taken from the living room and moved down a hallway before being confined with the others in the bedroom. However, movement alone does not support a kidnapping charge"; evidence supported only robbery and not kidnapping, applying *State v. Buggs*, 219 Kan. 203, Syl. ¶ 10, 547 P.2d 720 [1976]).

In the one Kansas kidnapping case with somewhat similar facts, *State v. McCoy*, No. 110,827, 2015 WL 3632037 (Kan. App. 2015) (unpublished opinion), *rev. denied* 304 Kan. 1020 (2016), the panel found that the defendant's action of holding the victim around her shoulders while pointing a gun at her constituted a taking but did not discuss confining. The victim had entered the hotel room willingly, so she was not taken to the hotel room. Confining was implicit, though, because the defendant prevented the victim from leaving the room. In finding confinement, the panel summarized:

7

"Thus, while Spencer [the victim] voluntarily entered the room, at some point McCoy grabbed her, physically held on to her with his arm, and held a gun on her [pointed at her chest and under her chin]. Based on Spencer's statements during the standoff and as she was exiting the hotel room, she was not voluntarily being held by McCoy. As a result, McCoy's argument that there was not sufficient evidence to support the alternative means of kidnapping by taking fails because his actions of physically holding onto Spencer while pointing a gun at her *constitutes a taking*." (Emphasis added.) *McCoy*, 2015 WL 3632037, at *17.

The panel found: "The evidence presented at trial overwhelmingly supports that he used Spencer by taking and confining her by force or threat with the intent to hold her as a shield or hostage." 2015 WL 3632037, at *15.

The appellate courts in Massachusetts have considered issues of confinement in a manner similar to our present case, where the victim walked with the defendant:

"Rose [the victim] was shown a gun and as a result, she was placed in fear. The defendant also pulled her by her jacket and constrained her by holding on to her backpack while they walked toward the truck. These facts demonstrated that her movements were restrained and provide sufficient evidence from which the jury could reasonably infer that the defendant forcibly confined Rose against her will." *Com. v. Lent*, 46 Mass. App. 705, 710, 709 N.E.2d 444 (1999).

We believe the State's evidence in this case, when considered in light of the discussion in *Ramirez* and the nontechnical commonplace definitions of confinement noted above, provide ample support for a finding that Lloyd confined his girlfriend.

Turning again to the sufficiency of the evidence, Lloyd argues there was no confinement, pointing to the State's closing argument where the prosecutor acknowledged the alternative means of confining but did not recite any evidence brought out at trial. The prosecutor stated:

"Or that he confined her, so she couldn't go. And that confine word I will talk a little bit more about in a second. . . .

"The second element that he did so, did he hold her, confine her with the intent to use her as a shield or a hostage? Well, he kept her between the officers and himself. So I'm—it just dawned on me. I'm going to come back and hit that confined a little bit harder in a second."

Lloyd argues that the State did not return to that element and did not introduce sufficient evidence during the trial.

The evidence is essentially uncontroverted that Lloyd had his hand or arm on Hartman or that they were holding hands during most of the encounter. Beyond that, the parties dispute the nature, extent, and intent of the contact. Since we believe our law supports the conclusion that a person can be confined by being held by another's hand or in another's arms, we find there is sufficient evidence that these actions occurred in the record to support Lloyd's conviction.

Lloyd relied on Hartman's testimony that she was there willingly, on the inconsistencies in the officers' direct testimony, and on the officers' testimony on cross-examination. For example, on cross-examination, Sergeant Buller stated that Hartman was not pulling away from Lloyd to try to get away.

The State argues that Hartman was "physically controlled" by Lloyd. Sergeant Radloff testified he could see that Lloyd was in contact with Hartman but could not tell if Lloyd "had his arm around her like over her shoulder or around her neck or was just holding on to the back of her shirt collar, the clothing she was wearing." Radloff went on to say that Lloyd "definitely had a grasp where she couldn't get away," and defense counsel objected that it was speculation. The district court judge sustained the objection and instructed the jury to disregard the testimony that she could not get away.

9

Sergeant Buller had the impression that the victim was a hostage. He testified that Lloyd moved behind Hartman and "grabbed her with one hand, or one arm." He testified that Lloyd was holding her and guiding her from behind and jerking her from side to side so that she was always between Lloyd and Buller. Buller testified that Lloyd told him that he had a knife and was going to cut or kill Hartman and that Lloyd sometimes held the knife beside her head, by her side, or behind her.

The point is that the jury has already weighed the evidence and credited the State's witnesses over those of the defense. We do not reweigh the evidence and must consider only whether the State's evidence is adequate to support the conviction. Since we find that the term confined can encompass holding a person with your hand or arm, or brandishing knives around them, there is sufficient evidence that these actions occurred and the State has met its burden of proof.

Lloyd's final issue is that contact between a juror and a witness should have compelled the district court to grant a mistrial. He argues that the district court erred in denying his motion for a mistrial predicated on contact between one of his defense witnesses and a juror. Lloyd preserved this issue below by making a motion at the time the juror was interviewed and again after the verdict was read. In both instances, the court denied the motion.

A trial court may declare a mistrial because of "[p]rejudicial conduct, in or outside the courtroom, which makes it impossible to proceed with the trial without injustice to the defendant or the prosecution." K.S.A. 22-3423(1)(c). In considering a motion for mistrial, the trial court must first determine if there is some fundamental failure of the proceeding. If so, the trial court must assess whether it is possible to continue the trial without injustice. The trial court must determine if the damaging effect can be removed or mitigated by admonition or instruction to the jury. If not, the trial court must determine

10

whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

On appeal, the trial court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard. *State v. Williams*, 299 Kan. 509, 559, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Judicial discretion can be abused in three ways: (1) if no reasonable person would have taken the view adopted by the trial court; (2) if the judicial action is based on an error of law; or (3) if the judicial action is based on an error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

Here, a juror reported that a witness made contact with him and the district court held an in camera hearing with both counsel and the defendant present, where the juror explained that he did not think it was a factor until he saw the stepfather come in to testify as a witness. The juror reported that the stepfather had approached him the day before during the lunch break at a Burger King restaurant and asked if he was on the jury panel. The juror answered that he was at the courthouse. The man tried to introduce the juror to Lloyd's mother, but the juror "ignored him, because the orders you [the judge] had given us about talking about the trial." The juror left the restaurant as soon as he got his food.

The district court judge asked the juror about his ability to discharge his duties as a juror:

> "[I]f I instruct you that you are to disregard that contact and not include any thought of that encounter in your evaluation of this case, which I will also instruct everyone else on the jury. That you are to decide the case solely . . . on the evidence presented, would you be able to follow my instruction?"

The juror stated that he would "try [his] best and that's what [he] agreed to." The judge indicated that she did not view the stepfather's testimony as necessary to the case. Lloyd requested that the juror be removed but stated he would not be willing to waive his right to a trial by 12 jurors and demanded a mistrial be declared.

In his brief, Lloyd alleges two specific errors by the district court in denying his motion for a mistrial: its statement that the contact was "'a friendly encounter'" and its statement that it had "'the utmost faith that [the juror] will abide by instruction to disregard any contact that happened spontaneously at the Burger King restaurant yesterday.'"

The State points out that the contact Lloyd complains of was initiated by one of his defense witnesses, who was, in fact, his stepfather. The State argues that a rule allowing a mistrial for every contact between a juror and a witness would cause "preposterous outcomes" where any defendant who perceived that his trial was going poorly could simply have one of his witnesses approach a juror and then secure a mistrial.

Our Supreme Court has been sparing in the granting of mistrials under these circumstances. For instance, it found no grounds for a mistrial in *Williams*, where a juror reported that he saw the defendant mouth to his wife, "'Stop lying'" after she gave alibi testimony for him. 299 Kan. at 557. Even with a further incident—where a witness who was leaving the stand pointed at the defendant and said he "'better talk to his 'baby mama'"—the irregularities did not rise to the level of cumulative prejudice. 299 Kan. at 558. In *State v. Pringle*, No. 107,874, 2013 WL 2395552, at *3 (Kan. App. 2013) (unpublished opinion), a panel of this court found no prejudice requiring a mistrial where two jurors spoke with a police officer who was the next witness to testify for the State. *Pringle* is also helpful because it lists Supreme Court cases where no substantial prejudice was found in various witness-juror interactions.

12

The district court did not abuse its discretion in denying the motion for a mistrial. The court took proper steps to determine whether there was a fundamental failure in the proceeding: It queried the juror about the effect of the contact on his ability to be impartial and whether he would be able to disregard the contact and decide the case based solely on the evidence. During that inquiry, defense counsel was present and able to question the juror. While it would have been far preferable for the district court to obtain an explicit promise in camera from the juror to follow the court's directions and disregard the encounter, rather than the somewhat ambiguous promise to "try [his] best," we do not view this omission as requiring a new trial.

Even if there was a fundamental failure in the proceeding, instructions can cure it to prevent substantial prejudice to the defendant's right to a fair trial. See *Ward*, 292 Kan. at 550. The district court asked the juror whether he could follow the court's instruction to "disregard that contact and not include any thought of that encounter in your evaluation of this case," and the juror agreed he would to the best of his ability. Appellate courts presume that juries follow the court's admonitions; and in fact, here, the juror was so careful to follow the court's admonitions that he reported the contact with the witness. See *State v. Barncord*, 240 Kan. 35, 44-45, 726 P.2d 1322 (1986). Thus, any potential substantial prejudice was cured by the district court in its meeting with the juror and in the general instructions the juror heard with the rest of the jury panel.

Lloyd has failed to demonstrate that the actions of his stepfather and the judge's interaction with the juror amount to a fundamental failure in the proceeding or substantially prejudiced his right to a fair trial. Thus, he has failed to carry his burden and prove that denial of his motion for a mistrial was error. The district court properly denied Lloyd's motion for a mistrial.

Affirmed.

13

MALONE, C.J., concurring: I concur with the majority that Todd J. Lloyd's conviction of kidnapping should be affirmed. In particular, I agree there was sufficient evidence that Lloyd committed kidnapping by "taking" and by "confining" Jennifer Hartman by force or threat. I write separately to express my view that under the analysis now used by the Kansas Supreme Court, the phrase "taking or confining of any person" does not set forth two alternative means of committing the crime of kidnapping.

In *State v. Haberlein*, 296 Kan. 195, 206-09, 290 P.3d 640 (2012), the Kansas Supreme Court addressed alternative means of committing aggravated kidnapping. The court addressed two specific issues: (1) whether the phrase "accomplished by force, threat, or deception" constituted alternative means of committing the crime and (2) whether the phrase "to facilitate flight or the commission of any crime" constituted alternative means of committing the crime. In addressing the first issue, the court stated:

> "Haberlein does not challenge the phrase 'taking or confining' in this appeal. Those two terms set out two alternative means of carrying out the crime of kidnapping and thus aggravated kidnapping. 'Taking' and 'confining' each denotes a distinct *actus reus* and they are, therefore, alternative means. But the phrase 'force, threat, or deception' addresses secondary matter, merely describing ways in which the *actus reus* can be accomplished. . . . Force, threat, and deception are not alternative means of committing a kidnapping or aggravated kidnapping, and we need not reach the question of whether sufficient proof of each was presented to Haberlein's jury." 296 Kan. at 208.

Although the issue of whether the phrase "taking or confining" constituted alternative means of committing kidnapping was not before the court in *Haberlein*, the court nevertheless expressed in dicta its opinion that these separate terms in the kidnapping statute constitute alternative means of committing the crime. In the very same paragraph, however, the court held that the phrase "accomplished by force, threat, or

14

deception" does not constitute alternative means of committing kidnapping. 296 Kan. at 208.

In *State v. Brown*, 295 Kan. 181, Syl. ¶ 7, 284 P.3d 977 (2012), our Supreme Court set forth the following analysis to determine whether a statute sets out alternative means of committing a crime:

> "When faced with an alternative means question, a court must determine for each statute what the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea*, *actus reus*, and, in some statutes, a causation element? Or is it merely to describe a material element or a factual circumstance that would prove the crime? The listing of alternative material elements, when the list is incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction."

The *Brown* court also indicated that "[s]tatutory structure, including separation of alternatives into distinct subsections, can be an important clue to legislative intent on alternative means." 295 Kan. 181, Syl. ¶ 8. Turning to the statute in question, K.S.A. 2015 Supp. 21-5408(a) defines kidnapping as follows:

> "(a) Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:
>
> (1) For ransom, or as a shield or hostage;
>
> (2) to facilitate flight or the commission of any crime;
>
> (3) to inflict bodily injury or to terrorize the victim or another; or
>
> (4) to interfere with the performance of any governmental or political function."

Under the statute, the legislature has expressed four distinct alternative means of committing kidnapping based on the defendant's "intent to hold" the victim: (1) for

15

ransom or as a shield or hostage; (2) to facilitate flight or the commission of any crime; (3) to inflict bodily injury or to terrorize the victim or another; or (4) to interfere with the performance of any governmental or political function. The options within each subsection of the statute do not state additional and distinct ways of committing the crime, but rather constitute options within a means of committing kidnapping. *Haberlein*, 296 Kan. at 207. Likewise, the phrase "accomplished by force, threat or deception" does not constitute alternative means of committing kidnapping. 296 Kan. at 208. As stated by the court in *Haberlein*, each term "merely sets out factual circumstances that may prove the distinct, material element of taking or confining." 296 Kan. at 208.

Applying the same analysis to the phrase "taking or confining of any person," these separate terms do not constitute alternative means of committing kidnapping. Each term merely sets out factual circumstances that may prove the distinct, material element of taking or confining, *i.e.*, holding the victim to accomplish one of the alternative means of committing kidnapping set forth in the statute. The Kansas Legislature does not intend for the terms "taking" and "confining" to be separate alternative means of committing kidnapping, as evidenced by the statutory structure our lawmakers chose to employ. Our Supreme Court's dicta to the contrary in *Haberlein* is wrong. See 296 Kan. at 208.

Lloyd's case provides a good example of why the terms "taking" and "confining" do not set forth alternative means of committing kidnapping. When Intensive Supervision Officer Don Wilkins and Sergeant Eric Buller arrived at Lloyd's residence, they saw Lloyd in the front doorway. Lloyd quickly closed the door, and Wilkins saw him leave the residence with Hartman through a back door. When Buller saw Lloyd and Hartman on the street, he told them to stop because Lloyd was under arrest. Buller testified that Lloyd moved behind Hartman and "grabbed her with one hand, or one arm" and yelled something at him, which he initially thought was that Lloyd had a gun, but Lloyd then said he had a knife and would cut or kill Hartman. It appeared to Buller that throughout

16

the encounter, Lloyd was guiding Hartman from behind and that he was holding her by her shoulder or arm so that she was always between him and Lloyd.

There was no separate and distinctive *actus reus* here. Lloyd's conduct in taking and confining Hartman was one continuous act. Likewise, there was no separate and distinctive *mens rea* to support the crime. Lloyd's mental state in taking Hartman was the same as his mental state in confining Hartman. The gravamen of the crime was that Lloyd took or confined Hartman, accomplished by force or threat, with the intent to hold her as a shield or hostage or with the intent to facilitate his flight from the officers. Under the analysis employed by our Supreme Court in *Brown*, the terms "taking" and "confining" do not set forth alternative means of committing kidnapping.

In sum, the State charged Lloyd with the alternative means crime of kidnapping. The alternative means were that Lloyd took or confined Hartman, accomplished by force or threat, with the intent to hold Hartman (1) as a shield or hostage or (2) to facilitate flight from the officers. The jury found sufficient evidence to find Lloyd guilty of each alternative means, and he was sentenced only for one count of kidnapping in violation of K.S.A. 2015 Supp. 21-5408(a)(1) (kidnapping with intent to hold victim as a shield). For the reasons stated herein, the terms "taking" and "confining" do not set forth alternative means of committing kidnapping, and the State was not required to establish sufficient evidence of both terms in order for the jury to find Lloyd guilty of kidnapping.

17