NOT DESIGNATED FOR PUBLICATION

No. 113,819

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT DAVID SOULIA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Opinion filed May 20, 2016. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Andrew Hamline*, legal intern, and *Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ARNOLD-BURGER, J., and BURGESS, S.J.

*Per Curiam*: Robert David Soulia appeals from his convictions of criminal threat and two counts of criminal trespass in connection with certain events occurring at his parents' home. Soulia argues there was not sufficient evidence to convict him of the charges based upon the manner in which the jury was instructed. In addition, Soulia asserts there was insufficient evidence to support the jury's findings that his convictions were crimes of domestic violence. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Emma Soulia and her husband live in Merriam, Kansas. They have three sons, including 57-year-old defendant Robert Soulia. For several months during 2014, Robert lived at the Merriam home with his parents off and on. Although his residency with them was intermittent, Robert had a key to the house and was free to come and go as long as he followed certain rules. These rules included: Robert was not to consume alcohol, was to keep reasonable hours, and was to pick up after himself. Robert helped with some remodeling work on the house, for which Emma paid him $10 per hour. Emma, who was 76, suffered from multiple sclerosis.

Things between Emma and Robert changed on October 2, 2014. On that date, Robert arrived at the home at 6 a.m. "reeking of alcohol," contrary to one of his parents' conditions. A few days before, Emma and her husband had been out of town. Upon their return they found Robert had left food out on the counter and truck parts on the kitchen floor. When Robert arrived on October 2, 2014, his father questioned him about the mess and Robert became very angry and verbally attacked his father, stating he was going to sue him and making other bizarre statements. At this time, another of Emma's sons, Mark Soulia, was on the telephone with Emma and overheard the altercation. Mark is a retired police officer who recently returned to the Johnson County area.

As a result of what he heard, Mark went to his parents' home. After Mark arrived, they decided it was best if Robert did not return to the house. Emma told Robert he was no longer welcome in their home. Robert agreed to leave but rejected offers to help him find someplace to go. When he arrived, Mark found Robert several houses down from their parents' home. Mark talked with Robert and told him that his behavior was abusive toward their 80-year-old father and that he could not behave in that manner. Mark told Robert that his mother did not want him back on the property and that he should return the house key. Robert, who smelled of alcohol, willingly gave Mark the house key. Mark

told Robert that if he returned to the house, their parents would call the police. Robert's inoperable truck, which had a camper shell, remained outside the house at the curb. Later that day, Mark placed Robert's clothing, tools, and other items from the house in his truck. Mark offered to tow the truck somewhere else for Robert, but Robert refused.

All was normal until Sunday, October 12, 2014. Emma was up early preparing for breakfast and getting ready for church. Her husband and great-grandson were still asleep. About 6:40 a.m., someone either loudly knocked on the door or rang the doorbell. When Emma went to the door, she saw Robert outside. He asked if he could come inside and use the phone. Emma replied, "I'm not willing to do that. We've already agreed that it's better if you stay away from the home." Robert became very angry and upset. He called Emma a hypocrite and stated that he was the Christian not her. Robert further stated that when she left the home, he would blow up the house. Both the storm door and the primary wood door were locked so Robert could not enter, but he shouted through the doors. Emma was very scared. Robert had never threatened her like this before, and she thought he might follow through with his threat because his bizarre behavior had been escalating over the last few months. Emma watched him leave, heading west toward where the inoperable truck was parked.

Emma then called her son Mark and told him what had happened. Mark testified that his mother was very upset and told him the Robert had come to the door and became angry when she refused to open the door. She reported that Robert then said that when they left, he was going to blow up the house. Mark asked for a description of Robert's attire and the direction he was heading. Mark then called the police and reported the incident. By the time Mark arrived at his parents' home, police officers were there talking to Emma. Mark drove around looking for Robert but did not find him. By the time Mark returned to the house, the police had left and his parents had left for church. Mark waited at the house for his parents to return and noticed some toilet paper and several books of matches in the front yard. There also was uncooked food debris.

3

Officer Jeffrey Magee of the Merriam Police Department responded to Mark's call. The officer spoke with Emma, who reported Robert's actions and threat. Officer Magee testified Emma seemed nervous and upset and that she believed Robert would follow through on his comments. The officer learned Robert did not have permission to be at the residence that day. Officer Magee attempted to locate Robert that day but was unsuccessful.

When Emma returned to the residence after church she found toilet paper and matches in the yard. Mark testified Emma was still very upset and scared after returning home. Mark suggested Emma and her husband stay at his place for awhile as he was concerned that Robert would carry out his threat. Because Emma was afraid of what Robert would do and because he was unpredictable, they agreed to stay with Mark. Emma never saw signs of forcible entry at the house, and she had no information that Robert entered the house after October 2, 2014.

About a week later, Mark picked up some of Robert's tools from a third party and took them to his abandoned truck. To ensure all the tools fit inside, Mark had to enter the truck and rearrange various items. Mark noticed that in addition to the tools, there was a gasoline container and several other containers, each with a small amount of gasoline in them.

On October 13, 2014, Emma learned the local police had found Robert at the Merriam home and arrested him. Merriam police officer Todd Sparks testified that on that morning he was dispatched to Emma's house to verify Robert was not at the home. When Officer Sparks arrived, he observed Robert on the east side of the house by a window. Robert was holding a large pry tool and a white bucket. Officer Sparks advised Robert he was prohibited from being at the residence. Robert responded that he had not been served with any paperwork. The officer asked Robert if he had been told he was not to be there, and he admitted he was so told. Officer Sparks advised Robert that a verbal

4

warning was enforceable. Robert told Officer Sparks he was trying to get in the residence to use the restroom and telephone.

Officer Sparks detained Robert for trespassing. Officer Sparks frisked and searched Robert but found no matches, and he did not recall smelling any gasoline. Robert was calm and cooperative. About this time, Sergeant John Walton arrived at the scene. Sergeant Walton was wearing a body camera he activated upon arriving at the family's residence. This recording was downloaded from the camera, saved on a disc, and the disc was placed into evidence. The disc was played for the jury during the trial. During Sergeant Walton's encounter with Robert, Robert admitted Emma had told him to stay away from the residence. Sergeant Walton's camera recorded Sparks' arrest and then Walton walked around the house to look for any indication of forcible entry; he found no obvious signs of forced entry. The recording was not provided in the record on appeal.

On October 14, 2014, Robert was charged in Johnson County District Court with one count of criminal threat and two counts of criminal trespass. With respect to the criminal threat charge, the State alleged Robert willfully communicated a threat to commit violence with the intent to place another (Emma Soulia) in fear or in reckless disregard of the risk of causing such fear. The two criminal trespass charges asserted that on October 12 and 13, 2014, Robert knowingly, willfully, and without authorization entered or remained "in a structure, upon land, or in a vehicle, to wit: the Emma Soulia premises" in defiance of an order not to enter said premises.

The evidence at trial was presented as outlined above. After the State rested its case, Robert's motion for a directed verdict was denied. Robert's sole witness was an investigator who took pictures of his truck and its interior in November 2014.

After a jury instruction conference and closing arguments, the case was handed over to the jury. The jury requested to review the video admitted into evidence. It also

5

requested a definition of "residence" as mentioned in the trespassing instruction. Later, when the jury returned, it found Robert guilty on all charges and found all charges were acts of domestic violence.

Sentencing took place on March 13, 2015. Defense counsel requested the court impose the minimum presumptive sentence of 5 months for criminal threat and that the misdemeanor trespassing charges run concurrently with the felony sentence. Counsel reported that Robert had already served 152 days and, therefore, had nearly completed even an aggravated sentence for the felony. The State concurred but asked for 12 months' postrelease supervision. At counsel's request, the court shortened the misdemeanor jail sentence from 6 months to 5 months and imposed a 5-month sentence for the felony threat conviction. All the sentences were to be served concurrently. Robert timely appealed from his convictions.

### DID THE STATE PRESENT SUFFICIENT EVIDENCE TO SUPPORT ROBERT'S CONVICTIONS FOR CRIMINAL THREAT AND TWO COUNTS OF TRESPASSING?

On appeal, Robert contends that there was insufficient evidence to support any of his convictions. Robert claims that the criminal threat statute only prohibits threats against persons, not property. Because his threat only involved damage to property, Robert reasons his conviction cannot be upheld. Robert also challenges this criminal trespass convictions based upon the way in which the instructions were phrased—*i.e.*, that he improperly entered Emma's residence. Because the evidence established that Robert never entered the home after October 2, 2014, he claims there was no evidence to support those convictions.

*Standard of Review*

When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the prosecution. The

6

conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or the credibility of witnesses. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014).

A portion of Robert's arguments involve the interpretation of the applicable statutes. Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12, *cert. denied* 135 S. Ct. 91 (2014).

*Criminal Threat*

Robert's challenge to the criminal threat conviction turns on the interpretation of K.S.A. 2014 Supp. 21-5415(a)(1). At the time of Robert's arrest, the criminal threat statute defined the crime as "any threat to: (1) Commit violence communicated with the intent to place another in fear, or to cause the evacuation, lock down or disruption in regular, ongoing activities of any building . . . or in reckless disregard of the risk of causing such fear or evacuation." K.S.A. 2014 Supp. 21-5415(a)(1).

Robert argues that because criminal threat is listed as a crime against person, the State was required to prove he threatened to harm a person. Because the only evidence was that he would blow up the house once Emma left for church, the family's absence from the house meant there was only a threat to property. Robert also cites that instruction given to the jury that to prove criminal threat, the State was required to prove "[t]he Defendant threatened to commit violence and communicated that threat with reckless disregard."

7

Robert's interpretation of K.S.A. 2014 Supp. 21-5415(a)(1) (formerly K.S.A. 21-3419[a][1]) is not persuasive, and he cites no meaningful legal authority to support his argument. Both the present and former statute defining criminal threat not only involved threats to commit violence *communicated* to another, but also threats to adulterate or contaminate food, animal feed, or public water supplies; or threats to expose any animal in this state to a contagious or infectious disease. K.S.A. 2014 Supp. 21-5415(a)(1)-(3); K.S.A. 21-3419(a)(1)-(3). Thus, the focus of the statute does not necessarily involve a direct threat to harm another person, it simply requires the communication of a threat to do violence with the intent to cause fear.

In addition, K.S.A. 2014 Supp. 21-5111(ff) specifically defines "threat" to mean "a communicated intent to inflict physical or other harm on any person *or on property*." (Emphasis added.) See also K.S.A. 21-3110(20) (repealed July 1, 2011). Various cases by Kansas appellate courts have recognized the threat under the criminal threat statute can include a threat to harm property. See *State v. Gunzelman,* 210 Kan. 481, 502 P.2d 705 (1972) (relying on the statutory definition of threat to determine the statute was not unconstitutionally vague); *State v. Miller*, 6 Kan. App. 2d 432, 435-36, 629 P.2d 748 (1981) (burning a cross on another's property, depending upon the surrounding facts, may constitute a threat prohibited by K.S.A. 21-3419[a]); *State v. Bursack*, No. 97,161, 2008 WL 2891056, at *1 (Kan. App. 2008) (warning that "if her company did not do what he wanted, they would 'pay, pay, pay'" sufficient under the circumstances to support a charge of criminal threat).

Based upon the clear terms of the statutes, construed together, Robert's threat to destroy Emma's home was sufficient to support a conviction of criminal threat. In light of the testimony of the various witnesses, there was sufficient evidence for a reasonable factfinder to find Robert guilty of criminal threat beyond a reasonable doubt.

*Criminal Trespass Convictions*

Robert also challenges the sufficiency of evidence to support his convictions for criminal trespass based upon the instructions provided to the jury. Those instructions were narrower than the charging document. In the complaint for counts II and III, the State alleged that on October 12 and 13, 2014, Robert did "knowingly, willfully and without authorization or privilege enter or remain in a structure, upon land, or in a vehicle, to wit: the *Emma Soulia premises*, in defiance of an order not to enter or to leave such premises." (Emphasis added.)

Both the State and defense proposed instructions on criminal trespass, however, that required the jury to find that "[t]he Defendant entered Emma Soulia's *residence*." (Emphasis added.) The court's ultimate instructions mirrored this language. During the jury instruction conference, the prosecutor cited the complaint's reference to the "Emma Soulia premises" and asked that the instruction state premises rather than residence. The defense objected, and the court decided to leave the instructions as written stating "I don't think it's going to cause any confusion for the jury."

Although the court did not believe the instruction would confuse the jury, the jury did send a question to the judge about those instructions. Specifically, the jury asked the court to "please define residence as it pertains to trespassing. Is property included as residency or is residency considered dwelling?" The State indicated it had "already made [its] argument" on the issue but did not object to the court's proposal to tell the jury the court could not give any further definition than already given.

Robert argues on appeal that the evidence was undisputed that he never "entered" Emma's "residence" on either October 12 or 13. Instead, the evidence was that Robert knocked on her front door on the October 12 and was found near a window at her house on the October 13. Robert argues the jury was required to follow the instructions, which

9

required proof he entered the residence. Thus, there was not sufficient evidence to support the trespass convictions. The State argues, however, that it was undisputed that Robert was immediately outside the residence on both occasions and knew he was not welcome on the property.

As the State notes, jury instructions in a criminal case are limited to the charges contained in the charging document and "should not be broader or narrower than the information." *State v. Turbeville*, 235 Kan. 993, 997, 686 P.3d 138 (1984). Most appeals occur, however, when instructions are broader than the charging document. See, *e.g., State v. McClelland*, 301 Kan. 815, 829, 347 P.3d 211 (2015) (discussing cases with such erroneous instructions).

In this case, however, the instruction was narrower than the complaint by referring to Emma's residence versus Emma's premises. The criminal code does not specifically define residence or premises, although it does define dwelling as a "building or portion thereof . . . or other enclosed space which is used . . . as a human habitation, home or *residence*." (Emphasis added.) K.S.A. 2015 Supp. 21-5111(k). This infers that a residence is an enclosed space. Similarly, the definition of residence in Kansas statutes "means the place which is adopted by a person as the person's place of habitation and, to which, whenever the person is absent, the person has the intention of returning." K.S.A. 2015 Supp. 77-201, *Twenty-third*; see also *State v. LeClair*, 295 Kan. 909, 912-13, 287 P.3d 875 (2012) (for purposes of the offender registration statute, reporting a change of address requires that the offender obtains a new place of habitation where the person intends to remain), *superseded by* K.S.A. 2015 Supp. 22-4905(e) (requiring transient offenders to register in jurisdiction where he/she is physically present).

The existing statutory definitions seem to confine the term "residence" to the actual building that is a person's place of habitation, not necessarily the land on which the residence sits. Premises, however, is defined as "3. A house or building, along with its

10

grounds." Black's Law Dictionary 1371 (10th ed. 2014). Thus, the court is faced with a situation where the jury instruction given is narrower than the allegations in the charging document.

The State cites to interpretations of "residence" used in the context of criminal search and seizure issues. The Kansas Supreme Court has recognized that for Fourth Amendment purposes, a resident has a right to privacy in his or her home and on the curtilage surrounding the home. See, *e.g., State v. Talkington*, 301 Kan. 453, 469-70, 345 P.3d 258 (2015) (visitor's right to privacy in curtilage of host's residence). Thus, the State seems to argue that even the narrower term of residence should be deemed to encompass Robert's entry of the curtilage of the property.

Generally, the courts have addressed issues about incorrect instructions which *broaden* the allegations of a charging document as a due process issue. As long as the defendant's ability to prepare and present a defense is not compromised, an erroneously overbroad elements instruction is not grounds for reversal. *State v. Hart*, 297 Kan. 494, 509, 301 P.3d 1279 (2013); *cf. State v. Brown*, 299 Kan. 1021, 1037-38, 327 P.3d 1002 (2014) (a defendant has no basis to complain if the court removes an alternative means contained in the charging document as there is no obvious prejudice when the accusation is reduced for jury deliberation).

Recently, the United States Supreme Court held that when facing a challenge to the sufficiency of evidence, judicial review should be based on the elements of the charged crime, not on the elements set forth in an erroneous jury instruction. See *Musacchio v. United States*, 577 U.S. ___, 136 S. Ct. 709, 715-16, 193 L. Ed. 2d 639 (2016). The *Musacchio* Court upheld a computer crime conviction even though the jury instructions added an element beyond the statutory elements and charging document. The Supreme Court concluded the elements of the crime were proven and the defendant had an adequate opportunity to defend himself on the charges. The Supreme Court also

11

upheld the conviction even though the government did not object to the erroneous instruction. 136 S. Ct. at 715.

*Musacchio* applies due process principles in resolving the issue of erroneous jury instructions. It is consistent with Kansas appellate court decisions resolving the same type of problem. As our court has noted, the "State is bound by the wording of its charging document, and the prosecution and district court must use caution in conforming the jury instructions to the charges." *McClelland*, 301 Kan. at 828 (citing *State v. Haberlein*, 296 Kan. 195, 210-11, 290 P.3d 640 [2012]). It certainly it not unfair to require the defendant to be similarly bound when it comes to situations where the court gives instructions, over the State's objection, that narrow the allegations of the charging document. Robert was able to prepare his defense based on the allegations of the information. Moreover, the government proved Robert trespassed by entering Emma's premises without authority and after being informed not to be there.

For these reasons, Robert's convictions are affirmed.

WAS THERE SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S
FINDINGS THAT ROBERT'S CRIMES WERE ACTS OF DOMESTIC VIOLENCE?

Robert's second challenge is to the jury's findings that all three of his convictions constituted crimes of domestic violence. Again, Robert claims there was insufficient evidence to support the jury's findings. First, Robert claims that his conviction for criminal threat does not qualify as an act of violence against Emma or an act of violence against her property because his threat was conditional. As to the criminal trespass charges, Robert again relies on the fact the State failed to prove Robert entered Emma's residence.

*Standard of Review*

As noted above, when the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or the credibility of witnesses. *Williams*, 299 Kan. at 525.

*Analysis*

Under the criminal code, domestic violence is "an act or threatened act of violence against . . . a family or household member." K.S.A. 2014 Supp. 21-5111(i). It also includes "any other crime committed against a person or against property . . . when directed against a family or household member by a family or household member." K.S.A. 2014 Supp. 21-5111(i). A family or household member is defined as "persons 18 years of age or older who are . . . parents or stepparents and children or stepchildren, and person who are presently residing together or have resided together in the past." K.S.A. 2014 Supp. 21-5111(i)(2).

With respect to Robert's arguments about the criminal threat conviction, the fact that he threatened a family member's property rather than the person herself does not remove the conviction from the domestic violence statute. The criminal threat is a crime Robert communicated to a family member. The fact the ultimate threat was to damage property is irrelevant.

Likewise, because Robert's only challenge to the domestic violence designation in regard to his criminal trespass convictions mirrors his arguments that he did not enter

Emma's residence, the challenge fails for the same reasons set forth in regard to the affirmation of his conviction for trespass.

The designation of his conviction for criminal threat and trespass are affirmed.

Affirmed.