IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,685

STATE OF KANSAS,
*Appellee*,

v.

JOSE GARCIA-MARTINEZ,
*Appellant*.

SYLLABUS BY THE COURT

The phrase "taking or confining" in K.S.A. 21-5408(a) does not present alternative means of committing kidnapping and aggravated kidnapping; rather, it presents options within a means merely describing the factual circumstances that may prove the material element—the actus reus—of holding the victim to accomplish one of the four alternative means of committing kidnapping set forth in the statute. To the extent language in *State v. Haberlein*, 296 Kan. 195, 290 P.3d 640 (2012), may suggest "taking" and "confining" are distinct actus rei intended by the Legislature to create alternative means, we disapprove it.

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Oral argument held December 14, 2023. Opinion filed April 26, 2024. Affirmed.

*Ryan Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

1

STANDRIDGE, J.:  This is Jose Garcia-Martinez' direct appeal following his convictions for first-degree felony murder, aggravated kidnapping, aggravated battery, and battery. Garcia-Martinez raises two issues on appeal. He argues the State presented alternative means of committing aggravated kidnapping and claims the evidence was insufficient to support a finding of guilt on each of the alternative means on which the jury was instructed. He also argues the district court erred in refusing to give a unanimity instruction because the jury heard evidence of multiple acts that could have supported his aggravated kidnapping conviction.

Garcia-Martinez is not entitled to relief on either issue. First, the phrase "taking or confining" does not present alternative means for committing kidnapping or aggravated kidnapping; rather it presents options within a means merely describing the factual circumstances that may prove the material element of holding the victim to accomplish one of the four alternative means of committing kidnapping set forth in the statute. Second, a unanimity instruction was not required here because the evidence established a single continuous incident of aggravated kidnapping, not multiple acts.

FACTUAL AND PROCEDURAL BACKGROUND

On July 2, 2020, Candi Morris arrived at the Wichita Police Department to report a potential murder that had occurred the day before at her residence located on South San Pablo Lane, where she lived with Matthew Small and Ariana Cook. Morris said that the day before, July 1st, she left home to run errands. As she was leaving, Morris saw Garcia-Martinez get out of a tan car and go inside her house. Garcia-Martinez was with a Black man that Morris did not know. The man was later identified as Roy Hayden. After about an hour, Morris arrived back home but was at first unable to get inside because the door was locked.

2

After someone finally opened the door, Morris went inside and tripped over Hayden, who was on the ground near the front door. Morris said Hayden's eye was swollen, his face "looked like hamburger meat," and he was not moving. According to Morris, several individuals were inside the residence, including Cook, Lawrence Bailey, Carlos Delgado, and Garcia-Martinez. Bailey stood by the front door with a gun and told the men to "shut [Hayden] up." Morris saw Garcia-Martinez stomp on Hayden's chest and head and said he and Delgado punched Hayden before dragging him into the bathroom. Morris was forced into a bedroom but heard sounds coming from the bathroom that sounded like the men were hitting Hayden with a hammer and Hayden was begging for his life. After about 20 minutes, Morris saw Garcia-Martinez and Delgado carry Hayden out of the house and drive away in the tan car. Hayden was wrapped in a blue curtain or sheet and had white trash bags over his head. Morris said she was then forced to clean the bathroom, where she used soap and bleach to clean up blood and pieces of flesh. Eventually, Morris managed to escape from the house, and she reported the incident to the police. Morris was unsure of Hayden's condition and was very concerned that he might be dead or dying.

Based on Morris' statements, law enforcement obtained a search warrant for the South San Pablo residence and conducted a search. It appeared the residence had been recently cleaned. Law enforcement seized five trash bags from the kitchen which contained several items of potential evidentiary value, including empty bottles of bleach, hydrogen peroxide, cleaning supplies, bloody rags, clothing, and shoes. They discovered bloodstains on the floor in the living room and the bathroom, as well as in the hallway leading to the bathroom. Law enforcement also located multiple hammers, several loaded firearms, and a wallet containing identification and credit cards belonging to Hayden.

The next day, law enforcement located and interviewed Delgado. Delgado admitted that he was at the South San Pablo residence on July 1, 2020, with Small, Cook,

3

and Bailey. Delgado said that Garcia-Martinez arrived with Hayden, who the group did not know. Delgado claimed the group was high on methamphetamine, causing them to become increasingly paranoid that Hayden was a law enforcement officer. He said they grew suspicious when Hayden turned down Cook's sexual advances and refused to let her pull his pants down to see if he was wearing a wire. Hayden also declined to give his wallet to Small. When Hayden stood up from the couch and tried to leave, Bailey pointed a gun at him and told him to sit back down. Hayden stood up again, and Bailey hit him on the head with a crowbar. Hayden started bleeding and fell back onto the couch, where Bailey hit him again with the crowbar.

According to Delgado, Bailey told him and Garcia-Martinez to "'take care of this situation.'" Delgado said that Garcia-Martinez kicked Hayden in the head several times. Once Hayden lost consciousness, Bailey told the men to clean up the blood and get rid of the body. When Hayden started to move, Bailey shot his gun in Hayden's direction. Delgado did not know whether Hayden was hit by the shot because there was already so much blood. Delgado said that he and Garcia-Martinez were left to "finish what happened" and described the situation as "[k]ill or get killed." Complying with Bailey's orders, they carried Hayden to the bathroom and put him in the bathtub. At some point, Hayden regained consciousness and tried to get up, so they held Hayden down and tied his hands and feet with wire and a dog leash. Garcia-Martinez then hit Hayden in the head with a hammer. As Hayden continued to struggle, Delgado held him down while Garcia-Martinez put three trash bags over Hayden's head. When Hayden finally stopped moving, they wrapped him in a blue blanket and put Hayden in the trunk of his car. After driving to various locations to seek help, Delgado claimed Garcia-Martinez eventually dropped him off at a Sonic restaurant. Delgado denied knowing where Garcia-Martinez took Hayden.

Days later, on July 6, 2020, law enforcement responded to a report of an abandoned gold Volvo in a Wichita parking lot. Video footage from a nearby business showed the Volvo had been left in the parking lot on the morning of July 1st. Upon arrival, law enforcement noted a strong odor of decomposition coming from the car. Inside the trunk, they discovered Hayden's decomposed body, along with a blue blanket, a duffle bag, and a pair of shoes. Hayden's hands and legs were bound together. Four garbage bags and a pillowcase were secured around his head. Hayden had hemorrhage marks and bruises around his neck, and there was evidence of blunt force trauma to his head and face. His legs were bruised, and he had a gunshot wound on his right leg. The coroner determined that Hayden's cause of death was asphyxia, with contributing conditions that included blunt force head trauma, the gunshot wound to his leg, and methamphetamine use. The coroner found Hayden's blunt force head trauma significant but could not say whether it was fatal due to the body's decomposition. The coroner also could not say whether Hayden was dead before he was put in the trunk of the car.

The State charged Garcia-Martinez with first-degree felony murder, aggravated kidnapping, and two counts of aggravated battery. To support the felony-murder charge, the State alleged Garcia-Martinez killed Hayden while committing the inherently dangerous felony of aggravated kidnapping.

The case proceeded to a jury trial, where the State presented the evidence outlined above. Garcia-Martinez testified in his defense, alleging compulsion. Garcia-Martinez admitted to bringing Hayden to the South San Pablo residence. When asked what happened there, he said, "I was in fear for my life, and in fear for the safety of my family throughout the course of this incident." On cross-examination, Garcia-Martinez admitted that although Hayden had no weapons and never threatened or hurt anyone, he was beaten with a crowbar, punched, and kicked. Garcia-Martinez admitted that he carried Hayden from the living room to the bathroom and hit him on the head with a hammer, but

5

he denied kicking Hayden in the head or putting bags over his head. Garcia-Martinez claimed he did not know Delgado and denied driving Hayden's car. But he did admit that he helped another man carry Hayden to the car and put Hayden in the trunk. Garcia-Martinez maintained that he acted out of fear for his life.

The jury found Garcia-Martinez guilty of felony murder, aggravated kidnapping, one count of aggravated battery, and one count of the lesser included offense of battery. The district court imposed a controlling hard 25 life sentence consecutive to a 13-month term of imprisonment.

Garcia-Martinez directly appealed his convictions to our court. Jurisdiction is proper. K.S.A. 22-3601(b)(3)-(4) (life sentence and off-grid crimes appeal directly to the Supreme Court).

ANALYSIS

Garcia-Martinez raises two issues on appeal. First, he argues the State presented alternative means of committing aggravated kidnapping—"taking or confining"—but failed to produce sufficient evidence to support each alternative means. Second, he contends the district court erred in refusing to issue a unanimity instruction because the jury heard evidence of multiple acts that could have supported his aggravated kidnapping conviction. We address each argument in turn.

1. *Alternative means*

Garcia-Martinez argues the State presented alternative means of committing aggravated kidnapping, but the evidence was insufficient to support a finding of guilt on each of the alternative means on which the jury was instructed. Because the aggravated

6

kidnapping charge also served as the inherently dangerous felony supporting Garcia-Martinez' felony-murder charge, he seeks reversal of both convictions. See K.S.A. 21-5402(a)(2), (c)(1)(B).

Framing the issue primarily as a claim of instructional error, the State suggests Garcia-Martinez invited any error by requesting a jury instruction containing both alleged alternative means. But Garcia-Martinez does not challenge the district court's jury instructions. Rather, he argues the evidence is insufficient to support the alternative means of aggravated kidnapping as charged by the State and set forth in the jury instructions. See *State v. Smith*, 317 Kan. 130, 132, 526 P.3d 1047 (2023) (alternative-means issue "implicates whether there is sufficient evidence supporting the conviction").

*Standard of review and relevant legal framework*

An alternative-means crime is one that can be committed in more than one way. *State v. Rucker*, 309 Kan. 1090, 1094, 441 P.3d 1053 (2019). The Legislature creates an alternative-means crime by enacting criminal statutes which list distinct alternatives for a material element of the crime. See *State v. Brown*, 295 Kan. 181, 199-200, 284 P.3d 977 (2012). A district court presents the jury with an alternative-means crime when it issues jury instructions that incorporate more than one of the distinct statutory alternatives for a material element of the crime. *State v. Sasser*, 305 Kan. 1231, 1239, 391 P.3d 698 (2017). So if a statute contains alternative means and both means are submitted to the jury, "'sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt.'" *State v. Cottrell*, 310 Kan. 150, 157, 445 P.3d 1132 (2019).

In contrast, when criminal statutes "merely describe a material element or a factual circumstance that would prove the crime," the Legislature has created "options within a

7

means." *Brown*, 295 Kan. at 194, 196-97. Options within a means describe secondary matters that "do not state additional and distinct ways of committing the crime" and thus do not implicate statutory jury-unanimity protections. 295 Kan. at 196-97.

Analysis of an alternative-means claim must first consider whether the district court presented an alternative-means crime to the jury. This determination involves consideration of the relevant statute's language and structure to decide whether the Legislature meant to list distinct alternatives for an element of the crime. "Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law" over which this court has unlimited review. *Brown*, 295 Kan. at 193-94. If alternative means were not presented, the error inquiry ends. 295 Kan. at 200.

*Statutory analysis*

To determine whether a statute presents alternative means of committing a crime, "a court must analyze whether the legislature listed two or more alternative distinct, material elements of a crime—that is, separate or distinct *mens rea*, *actus reus*, and, in some statutes, causation elements." *Brown*, 295 Kan. at 199-200. The *Brown* court recognized that the structure of a statute may be a clue to legislative intent, such as by separating intended alternatives into distinct subsections. 295 Kan. at 200. But a statute's structure is not dispositive. See *State v. Foster*, 298 Kan. 348, 354-55, 312 P.3d 364 (2013) ("Regardless of the statutory structure, the legislature may list multiple descriptors within a single means of committing a crime that *Brown* labeled 'options within a means.'"). As we noted in *Brown*, a court considering alternative means should determine the purpose of the disjunctive "or":

"Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea*, *actus reus*, and, in some statutes, a causation element? Or is it to merely describe a material element or a factual circumstance that would prove the crime? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue . . . . But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction." 295 Kan. at 194.

Turning to the statute at issue, K.S.A. 21-5408 defines kidnapping as follows:

"(a) Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:
      (1) For ransom, or as a shield or hostage;
      (2) to facilitate flight or the commission of any crime;
      (3) to inflict bodily injury or to terrorize the victim or another; or
      (4) to interfere with the performance of any governmental or political function."

Aggravated kidnapping requires an additional element that bodily harm be inflicted on the victim. K.S.A. 21-5408(b).

The State charged Garcia-Martinez with aggravated kidnapping under K.S.A. 2020 Supp. 21-5408(a)(3). At trial, the district court issued a jury instruction that accurately set forth the statutory elements the State was required to prove:

"1. The defendant took or confined Roy L. Hayden by force or threat.
"2. The defendant did so with the intent to hold Roy L. Hayden to inflict bodily injury on or to terrorize Roy L. Hayden, or another.
"3. Bodily harm was inflicted upon Roy L. Hayden.
"4. This act occurred on or about the 1st day of July, 2020, in Sedgwick County, Kansas."

9

Relying on *State v. Haberlein*, 296 Kan. 195, 207-08, 290 P.3d 640 (2012), Garcia-Martinez argues the phrase "took or confined" in the first element presents alternative means of committing the crime of aggravated kidnapping. In *Haberlein*, this court analyzed various provisions of K.S.A. 21-3420, the previous version of the kidnapping statute, to determine whether they contained alternative means. The current statute, enacted on July 1, 2011, made an organizational change by combining kidnapping and aggravated kidnapping into a single statute, but is otherwise nearly identical to the version of the statute considered in *Haberlein*. Compare K.S.A. 21-3420 with K.S.A. 21-5408; *Haberlein*, 296 Kan. at 202.

The defendant in *Haberlein* alleged that two provisions of the kidnapping statute presented alternative means: (1) force, threat, and deception and (2) facilitation of flight and facilitation of the commission of any crime. 296 Kan. at 207. Although the defendant's alternative means arguments did not include the "taking or confining" provision of the statute, this court's analysis did:

> "Haberlein does not challenge the phrase 'taking or confining' in this appeal. Those two terms set out two alternative means of carrying out the crime of kidnapping and thus aggravated kidnapping. 'Taking' and 'confining' each denotes a distinct *actus reus* and they are, therefore, alternative means. But the phrase 'force, threat, or deception' addresses secondary matter, merely describing ways in which the *actus reus* can be accomplished. . . . Force, threat, and deception are not alternative means of committing a kidnapping or aggravated kidnapping, and we need not reach the question of whether sufficient proof of each was presented to Haberlein's jury." 296 Kan. at 208.

This court also held that the different subsections of the kidnapping statute create alternative means:

10

"When we examine the language of the entire statute, it appears the legislature did signal through structure an intent to define alternative means of proving the *mens rea* for kidnapping and aggravated kidnapping. It did not stop with 'intent to hold' but listed several motivations for that intent to hold. Each of the subsections that follows states an additional and distinct way of committing the crime, and proof of one of these additional and distinct material elements must be shown in order to support a conviction. Thus, the different subsections create alternative means of committing a kidnapping.

"But the language on which Haberlein relies is *within* subsection (b). Facilitation of flight and facilitation of the commission of a crime are mere options within a means. The members of the legislature grouped certain potentially distinct and potentially overlapping items, which must mean they did not want jurors to have to split hairs over whether a kidnapping or aggravated kidnapping was committed to facilitate flight or the commission of any crime. Again, we need not reach the question of whether the evidence was sufficient on each." 296 Kan. at 209.

Since *Haberlein* was decided, Kansas appellate decisions have generally relied on it for the proposition that "taking or confining" present alternative means of committing kidnapping or aggravated kidnapping. See, e.g., *State v. Couch*, 317 Kan. 566, 583, 533 P.3d 630 (2023) ("By including only 'confining' and not 'taking,' the instruction eliminated one of the alternative means of committing kidnapping or aggravated kidnapping."); *State v. Ross*, No. 118,199, 2019 WL 847672, at *22 (Kan. App. 2019) (unpublished opinion) ("'[T]aking or confining' denotes two alternative means of committing kidnapping."); *State v. Lloyd*, No. 113,486, 2016 WL 6568746, at *2 (Kan. App. 2016) (unpublished opinion) ("Our Supreme Court has defined taking and confining as alternative means of committing the crime of kidnapping because each is a distinct *actus reus*."); *State v. McCoy*, No. 110,827, 2015 WL 3632037, at *16 (Kan. App. 2015) (unpublished opinion) ("'Taking' and 'confining' are alternative means of kidnapping.").

11

But as the State points out, there is at least some suggestion that *Haberlein*'s alternative means commentary on "taking or confining" is mere dicta and therefore not binding. See *Law v. Law Co. Building Assocs.*, 295 Kan. 551, Syl. ¶ 1, 289 P.3d 1066 (2012) ("Dicta in a court opinion is not binding, even on the court itself, because the court should consider the issue in light of the briefs and arguments of counsel when the question is squarely presented for decision."); *Lloyd*, 2016 WL 6568746, at *7-9 (Malone, C.J., concurring) ("Although the issue of whether the phrase 'taking or confining' constituted alternative means of committing kidnapping was not before the court in *Haberlein*, the court nevertheless expressed in dicta its opinion that these separate terms in the kidnapping statute constitute alternative means of committing the crime."); *Ross*, 2019 WL 847672, at *22 (recognizing Judge Malone's concurring opinion in *Lloyd*); *State v. Gustin*, No. 123,274, 2022 WL 816268, at *6 (Kan. App. 2022) (unpublished opinion) (discussing dicta issue identified in *Lloyd* and *Ross*).

Citing then-Chief Judge Malone's concurring opinion in *Lloyd*, the State urges us to disregard *Haberlein*'s dicta and instead find that "taking or confining" do not present alternative means of committing kidnapping and aggravated kidnapping. In *Lloyd*, Judge Malone explained his reasoning as follows:

> "Under the statute, the legislature has expressed four distinct alternative means of committing kidnapping based on the defendant's 'intent to hold' the victim: (1) for ransom or as a shield or hostage; (2) to facilitate flight or the commission of any crime; (3) to inflict bodily injury or to terrorize the victim or another; or (4) to interfere with the performance of any governmental or political function. The options within each subsection of the statute do not state additional and distinct ways of committing the crime, but rather constitute options within a means of committing kidnapping. *Haberlein*, 296 Kan. at 207. Likewise, the phrase 'accomplished by force, threat or deception' does not constitute alternative means of committing kidnapping. 296 Kan. at 208. As stated by the court in *Haberlein*, each term 'merely sets out factual circumstances that may prove the distinct, material element of taking or confining.' 296 Kan. at 208.

"Applying the same analysis to the phrase 'taking or confining of any person,' these separate terms do not constitute alternative means of committing kidnapping. Each term merely sets out factual circumstances that may prove the distinct, material element of taking or confining, i.e., holding the victim to accomplish one of the alternative means of committing kidnapping set forth in the statute. The Kansas Legislature does not intend for the terms 'taking' and 'confining' to be separate alternative means of committing kidnapping, as evidenced by the statutory structure our lawmakers chose to employ. Our Supreme Court's dicta to the contrary in *Haberlein* is wrong. See 296 Kan. at 208." *Lloyd*, 2016 WL 6568746, at *8-9 (Malone, C.J., concurring).

As discussed, this court said in *Haberlein* that "taking or confining" provide alternative means for committing kidnapping and aggravated kidnapping because "'[t]aking' and 'confining' each denotes a distinct *actus reus* . . . ." 296 Kan. at 208. But the acts of "taking" and "confining" are not so distinct when we look closely at the meaning of these terms, the structure of the kidnapping statute, and the difficulty in separately applying "taking" and "confining" to the present facts.

To determine whether the Legislature intended for "taking or confining" to set out alternative means for committing the crime of kidnapping or aggravated kidnapping under K.S.A. 21-5408(a), we look to the statutory language enacted, giving common words their ordinary meanings. See *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). The Kansas Criminal Code does not define the terms "take" and "confine," so we may consult their dictionary definitions. See *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 (2017) ("Dictionary definitions are good sources for the 'ordinary, contemporary, common' meanings of words."). Relevant here, Black's Law Dictionary defines "take" as "[t]o obtain possession or control, whether legally or illegally" and "[t]o seize with authority; to confiscate or apprehend." Black's Law Dictionary 1754 (11th ed. 2019). And Black's Law Dictionary

13

defines "confinement" as "[t]he act of imprisoning or restraining someone; the quality, state, or condition of being imprisoned or restrained." Black's Law Dictionary 373 (11th ed. 2019). Read in isolation outside the context of the kidnapping statute, each term could be construed to have a distinct actus reus—taking involves the act of obtaining possession or seizing, while confining involves the act of imprisoning or restraining.

But in the context of our kidnapping statute, the terms are not so dissimilar. On its face, the crime of kidnapping is commonly understood to include both taking and confining. Indeed, kidnapping is defined as "[t]he crime of seizing and taking away a person by force or fraud, [usually] to hold the person prisoner in order to demand something from his or her family, employer, or government." Black's Law Dictionary 1040 (11th ed. 2019). Generally, kidnappers take victims to confine them. And a victim who is confined has also necessarily been taken. The essence of the crime of kidnapping is the unlawful restriction of a person's freedom. Based on this interpretation, "taking or confining" would be considered options within a means because each term merely describes the factual circumstances that may prove the material element of "holding the victim to accomplish one of the alternative means of committing kidnapping set forth in the statute." *Lloyd*, 2016 WL 6568746, at *9 (Malone, C.J., concurring); see *Smith*, 317 Kan. at 134 (Words present "only options within a means if . . . their role is merely to describe a material element or to describe factual circumstances in which a material element may be proven.").

And reading the phrase "taking or confining" as presenting options within a means aligns with this court's interpretation of the kidnapping statute as a whole. As we explained in *Haberlein*, the Legislature "signal[ed] through structure an intent to define alternative means of proving the *mens rea* for kidnapping and aggravated kidnapping" by separating distinct ways of committing the crime into multiple subsections. 296 Kan. at 209; see K.S.A. 21-5408(a)(1)-(4). The Legislature did not convey a similar intent to

14

define "taking or confining" as alternative means of proving the actus reus for kidnapping and aggravated kidnapping by placing them in different subsections of the statute. See K.S.A. 21-5408(a).

Finally, the facts in Garcia-Martinez' case illustrate why "taking or confining" do not set forth separate and distinct actus rei. The evidence at trial established that although Hayden voluntarily entered the residence, he did not remain there willingly. When Hayden tried to leave, he was hit over the head with a crowbar. To prevent Hayden from leaving, Garcia-Martinez participated in beating Hayden and transported him from the living room to the bathroom. In the bathroom, Garcia-Martinez physically restrained Hayden by beating him, tying restraints on his arms and legs, and suffocating him. Finally, Garcia-Martinez transported Hayden to the trunk of his car and later abandoned the car in a parking lot. This evidence established that Garcia-Martinez seized or obtained control over Hayden. Thus, a rational fact-finder could conclude that a taking occurred. And these same facts also could be viewed as evidence of confinement because they establish the act of imprisoning or restraining. Garcia-Martinez' conduct was the same regardless of whether he was taking or confining Hayden. Either way, the evidence was sufficient to support Garcia-Martinez' aggravated kidnapping conviction.

In sum, we hold the phrase "taking or confining" in K.S.A. 21-5408(a) does not present alternative means of committing kidnapping and aggravated kidnapping; rather, it presents options within a means merely describing the factual circumstances that may prove the material element—the actus reus—of holding the victim to accomplish one of the four alternative means—each with distinct mens rea—of committing kidnapping. See K.S.A. 21-5408(a) (requiring State to prove the defendant intended to hold the victim "[1] [f]or ransom, or as a shield or hostage; [2] to facilitate flight or the commission of any crime; [3] to inflict bodily injury or to terrorize the victim or another; or [4] to interfere with the performance of any governmental or political function"). In so holding,

15

we expressly disapprove of any language in *Haberlein* that may suggest "taking" and "confining" are distinct actus rei intended by the Legislature to create alternative means.

## 2. *Propriety of multiple acts jury instruction*

Next, Garcia-Martinez contends the district court erred by declining his request to instruct the jury on multiple acts. When a case involves multiple acts, the jury must unanimously agree on which specific act constitutes the crime. K.S.A. 22-3421; *State v. King*, 297 Kan. 955, 977, 305 P.3d 641 (2013). To ensure a unanimous verdict in such cases, the district court must give the jury a unanimity instruction or the State must elect the particular act it relies on for the conviction. 297 Kan. at 978.

Garcia-Martinez claims the State presented evidence of four separate and distinct acts that the jury could have found amounted to aggravated kidnapping, so the jurors might have disagreed about which specific act constituted that crime. The State counters that a multiple acts instruction was unwarranted here because the evidence established that a single continuous incident, which could not be separated, formed the basis for the aggravated kidnapping charge.

This court generally reviews jury instruction errors by asking whether the party preserved the issue, whether the jury instruction is legally and factually appropriate, and whether any error requires reversal. See *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). But we use a more particularized test when, as here, a defendant challenges a district court's failure to give a unanimity instruction in a case potentially involving multiple acts. See *State v. Harris*, 310 Kan. 1026, 1039, 453 P.3d 1172 (2019). First, we determine whether the case involves multiple acts. Second, if the case does involve multiple acts, we consider whether an error occurred because the district court failed to

give a unanimity instruction and the State failed to elect which act it was relying on. Third, if there was an error, we decide whether it requires reversal. 310 Kan. at 1039.

Under the first step, we decide "'whether the defendant's actions could have given rise to multiple counts of the charged crime or whether the alleged conduct was unitary.'" *Harris*, 310 Kan. at 1039. In Kansas, "'acts are multiple acts if they are factually separate and distinct.'" *State v. Moyer*, 306 Kan. 342, 360, 410 P.3d 71 (2017). Incidents are factually separate when either independent criminal acts have occurred at different times or when a fresh impulse motivated a later criminal act. 306 Kan. at 360. Four factors guide our inquiry to determine whether conduct was unitary:  (1) whether the acts occurred at or near the same time; (2) whether they occurred at the same location; (3) whether an intervening event occurred between the acts; and (4) whether a fresh impulse motivated any portion of the acts. *Harris*, 310 Kan. at 1039. When the conduct is unitary, no unanimity instruction is necessary and the analysis ends. *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007).

At the instructions conference, the district court denied Garcia-Martinez' request for a unanimity instruction. Citing *State v. Staggs*, 27 Kan. App. 2d 865, 9 P.3d 601 (2000), the district court found the evidence established "a continuous incident that can't be factually separated from one another" and said that a unanimity instruction would be confusing for the jury.

Garcia-Martinez argues the district court's reliance on *Staggs* was misplaced because it is factually distinguishable. He claims a unanimity instruction was warranted because the jury heard evidence of four separate acts that it could have relied on to find an aggravated kidnapping occurred:

- Garcia-Martinez aided and abetted Bailey in confining Hayden when Bailey struck Hayden with a crowbar for attempting to leave the residence;

- Garcia-Martinez confined Hayden by kicking and beating him after he attempted to leave;

- Garcia-Martinez confined Hayden in the bathroom by beating him with a hammer and placing bags over his head; and

- Garcia-Martinez took and/or confined Hayden by placing him in the trunk of the car.

Contrary to Garcia-Martinez' assertion, the district court did not reference *Staggs* as a factually analogous case. Rather, the court mentioned *Staggs* because it was cited by the PIK Committee in the Notes on Use section of the applicable PIK instruction as authority for the multiple acts test. After explaining this test, the court discussed the evidence and determined Garcia-Martinez' actions did not involve multiple acts and instead constituted a continuous incident.

Applying the four-factor multiple acts test to the facts here fully supports the district court's finding of unitary conduct. Starting with the first factor, the timing of the events, the evidence establishes all the acts forming the basis for the aggravated kidnapping charge occurred around the same time. Contrary to Garcia-Martinez' assertion that the events occurred over the course of an entire night, the record reflects they took place during a short window of time on the morning of July 1, 2020. Morris testified that she saw Garcia-Martinez and Hayden arrive at the South San Pablo residence that morning as she left to run errands. When she arrived home about an hour later, Hayden was already on the ground. Morris saw Garcia-Martinez beat and kick Hayden and then transport him to the bathroom, where the violence continued. Morris estimated the men were in the bathroom for about 20 minutes before she saw Garcia-Martinez carry Hayden outside and drive away. Video surveillance from the parking lot where Hayden's tan

18

Volvo was found showed the car driving in the area on July 1st at 7:39 a.m. and in the parking lot at 8:30 a.m. Although it is unclear exactly when the attack on Hayden began on the morning of July 1st, the entire incident was over before 8:00 a.m.

As for the second factor, proximity of location, the acts forming the basis of Garcia-Martinez' aggravated kidnapping charge occurred inside or outside of the South San Pablo residence. The attack on Hayden began in the living room and continued after he was moved to the bathroom. Hayden's car was driven up to the residence, and Garcia-Martinez put him inside the trunk. Although Garcia-Martinez later drove Hayden to a different location, a taking and/or a confining occurred while the car was still parked outside the residence when Garcia-Martinez moved Hayden to the trunk of the car and confined him there.

As to the third and fourth factors, the record does not show any intervening event separating one act from another or a fresh impulse motivating any of Garcia-Martinez' conduct. Instead, the evidence demonstrated a causal relationship between all his actions, which stemmed from the group's suspicion that Hayden was a law enforcement officer. Each action was made in furtherance of the group's plan to silence and dispose of Hayden.

Garcia-Martinez' actions which formed the basis for the aggravated kidnapping charge involved a single course of conduct, not separated by distinct time periods, locations, or causal relationships. See *Harris*, 310 Kan. at 1040 (finding no multiple acts for kidnapping charge when defendant confined victim to her apartment for two hours and repeatedly forced her from room to room while demanding money); *State v. Kesselring*, 279 Kan. 671, 683, 112 P.3d 175 (2005) (finding no multiple acts where kidnapping was a continuous incident that could not be factually separated even though it happened over several hours, the victim was moved from one location to another, and the

victim was momentarily free and tried to escape); cf. *King*, 297 Kan. at 982 (finding multiple acts when defendant intentionally rammed into parked vehicles, left, then returned 5 to 10 minutes later and possibly damaged some vehicles again).

Because Garcia-Martinez did not commit multiple acts, the unanimity instruction he claims should have been given was not necessary. As a result, the district court did not err in failing to give a unanimity instruction.

Affirmed.