No. 124,612

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL A. ARREOLA,
*Appellant*.

SYLLABUS BY THE COURT

1.

When the State charges a person with a crime that can be committed in more than one way, it may present evidence of alternative means of committing that offense. A district court presents an alternative-means crime to a jury when its instructions incorporate multiple means for a single statutory element of an offense.

2.

Kansas courts no longer distinguish between alternative means for committing an offense and options within a means of committing a crime. Instead, appellate courts review district courts' instructions on alternative-means crimes under the same framework as other challenges to jury instructions.

3.

A jury instruction on voluntary intoxication is factually appropriate in aggravated-burglary cases when there is evidence presented at trial that could support a finding that the defendant was intoxicated and their mental faculties were so impaired that they could not form the specific intent necessary to commit that crime. Evidence that a person may

1

have lacked this level of intent due to intoxication tends to show the loss of the ability to reason, to plan, to recall, or to exercise motor skills.

4.

Prosecutors may not misstate the law or attempt to shift the burden of proof to the defendant. But prosecutors may argue that some evidence is more credible than other evidence and may use the art of rhetoric—within the confines of reason and the governing law—to convey the strength of the State's case to the jury.

Appeal from Shawnee District Court; DAVID B. DEBENHAM, judge. Submitted without oral argument. Opinion filed August 23, 2024. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Carolyn A. Smith*, assistant district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., MALONE and WARNER, JJ.

WARNER, J.: Daniel Arreola was convicted of several crimes after he broke into an apartment and attacked people inside. He appeals, challenging various aspects of the evidence presented at trial, the district court's instructions to the jury, and the prosecutor's closing argument, as well as the constitutionality of the statutory definitions of rape and aggravated criminal sodomy. We are unpersuaded by Arreola's constitutional claim. And after carefully reviewing the record and the parties' arguments, we conclude that Arreola's trial, though not perfect in all respects, was fair. We thus affirm his convictions.

2

On a July evening in 2015, three women hosted a party at their first-floor apartment in Topeka. The party lasted well into the night, with partygoers drinking alcohol and mingling inside the apartment and outside on a back patio, which was connected to the apartment's kitchen by a sliding glass door.

Sometime during the party, one of the hosts and a guest were talking on the patio. Arreola approached them and asked if he could join the party. They told him he could if he stayed on the patio outside. Several times throughout the night, Arreola made his way into the apartment and was told to leave. After the hosts were forced to ask Arreola to go back outside a third time, one of them locked the sliding glass door so he could not reenter. A guest recalled that Arreola "didn't put up much confrontation" and was disagreeable but not forcefully so—he acted in a way that "you would expect from a drunk person."

Around 4 a.m., Arreola started yelling from outside the glass door that he was going to break in. A guest tried to calm him down, but Arreola pulled out a gun and pressed it against the glass, pointing it at the people inside and repeating that he was going to break in. The guest immediately told everyone that Arreola was armed and to move away from the door and out of the kitchen.

Arreola kicked the door and made his way inside the apartment. He then started yelling that he "was FBI" and that if anyone moved, he would shoot them. Arreola approached the guest he had spoken with on the patio earlier—now lying on the floor behind a couch in the living room—and pressed the gun to the back of the guest's neck, telling him not to move or he would be shot. Another person who had been hiding in the living room started running down the hallway toward one of the bedrooms, and Arreola began chasing him. The guest in the living room then ran out the sliding back door and

into the parking lot. Arreola initially chased him outside but quickly gave up and went back into the apartment. The escaped guest called 911.

Back inside the apartment, Arreola approached the bedroom of one of the hosts (L.M.) where she and a guest (C.T.) were hiding. Arreola forced his way inside and told the two women to lie on the ground. Arreola climbed on top of C.T., put his gun to her chest, and told her that "he was FBI, and this was just protocol." He started going through C.T.'s pockets, and L.M. told Arreola to leave her alone. Arreola then went over to L.M., put his gun to the back of her head, pulled down her sweatpants and underwear, and forcibly penetrated her vagina and anus with his penis. While on top of L.M., Arreola pointed his gun at C.T. and said, "Don't fucking look at me."

In the meantime, Topeka police officers arrived at the scene. Hearing the officers, Arreola got off L.M. and flashed his gun outside the bedroom door at the officers. The officers withdrew from the apartment to establish a strategic position. Amid the turmoil, Arreola fled. Officers found him banging on another apartment door—three apartments down from where the incident occurred—and arrested him.

The officers took Arreola to the police station. He was interviewed by a detective, who testified at trial that Arreola appeared drunk and that much of what he said during the interview did not make sense. For example, when asked if he raped anyone, Arreola answered that he "was not raped by an officer." The detective also testified that Arreola said that he did not know what he had done that night.

Arreola was charged with several crimes. The case proceeded to trial, where the jury found Arreola guilty of aggravated burglary, three counts of aggravated assault with a deadly weapon, aggravated criminal sodomy, rape, and unlawful tampering with an electronic monitoring device—a crime Arreola was charged with after he removed his

4

GPS monitor and fled Kansas while released on bond. Arreola was sentenced to 257 months' imprisonment.

DISCUSSION

Arreola raises several arguments on appeal. He asserts that the jury instruction on aggravated burglary was faulty because it listed alternative means of committing that offense. He also claims that the district court should have instructed the jury on the potential effect that his voluntary intoxication had on his ability to form the specific intent required to commit aggravated burglary. And he asserts the prosecutor erred during closing arguments; that the statutes criminalizing rape and aggravated criminal sodomy are unconstitutional; and that the aggregation of these errors denied him a fair trial. We agree that an instruction on voluntary intoxication was legally and factually appropriate in this case. But the absence of that instruction was not a clear error that affected the outcome of the trial. And we are not persuaded by Arreola's remaining arguments. We therefore affirm his convictions.

1. *Arreola has not shown reversible error in the district court's jury instructions.*

Arreola challenges two aspects of the district court's instructions to the jury. He asserts that the court's instruction on aggravated burglary included alternative means of committing that offense that were not proved by the State beyond a reasonable doubt. And he claims that the court should have instructed the jury on voluntary intoxication to help the jury assess whether he could have formed the specific intent necessary to commit that crime. Arreola acknowledges that he neither objected to the aggravated-burglary instruction nor requested a voluntary-intoxication instruction. But he asserts that these alleged errors so clearly affected the outcome of his trial that they require a new trial for the aggravated-burglary charge.

When faced with a claim that an instruction should have been altered or that an unrequested instruction should have been given at trial, we must determine whether the instruction was appropriate under the law and whether it fit the evidence presented. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). If so, we consider whether the district court's instructions require reversal. *State v. Gentry*, 310 Kan. 715, 720, 449 P.3d 429 (2019). A person raising an instructional deficiency for the first time on appeal, as Arreola is here, did not allow the district court the opportunity to assess whether the instruction should have been given in the first instance. Thus, they must demonstrate that the absence of the instruction was clearly erroneous—that is, they must firmly convince the appellate court that the jury would have reached a different verdict if the instruction had been given. K.S.A. 22-3414(3); *State v. Craig*, 311 Kan. 456, 464, 462 P.3d 173 (2020); *Gentry*, 310 Kan. at 720-21.

### 1.1. *The district court's instruction on aggravated burglary was legally and factually appropriate.*

Arreola argues that the district court's instruction on aggravated burglary listed alternative means of committing that offense, triggering a higher evidentiary standard that the State had to meet for him to be convicted of that crime. Arreola notes that the district court did not instruct the jury to this effect; he asserts that the evidence presented did not otherwise meet the State's burden of proof.

The district court instructed the jury that, for the crime of aggravated burglary, the State was required to prove:

"1. The defendant entered a dwelling.
"2. The defendant did so without authority.
"3. The defendant did so with the intent to commit rape, aggravated assault, theft, or aggravated criminal sodomy therein."

6

Arreola did not object to this instruction. But on appeal, he claims that the specific criminal intents the court listed in its instruction—that Arreola entered *with the intent to commit rape, aggravated assault, theft, or aggravated criminal sodomy*—provided alternative means of committing aggravated burglary. He asserts the State was required to prove each of these possible intents beyond a reasonable doubt to avoid reversal. See *State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010) (super sufficiency test), *overruled by State v. Reynolds*, 319 Kan. ___, 552 P.3d 1 (2024).

When the State charges a person with a crime that can be committed in more than one way, it may present evidence of alternative means of committing that offense. *Reynolds*, 319 Kan. at ___, 552 P.3d 1, 5. A district court presents an alternative-means crime to a jury when its instructions "incorporate multiple means for a single statutory element" of an offense. 319 Kan. at ___, 552 P.3d at 5.

Arreola's case involves such a crime. To prove aggravated burglary under K.S.A. 2015 Supp. 21-5807(b), the State was required to demonstrate that Arreola entered the apartment "without authority . . . with intent to commit a felony, theft or sexually motivated crime therein." The district court narrowed this definition somewhat at trial after the parties submitted their proposed jury instructions, informing the jury that the State must prove that Arreola entered "with the intent to commit rape, aggravated assault, theft, or aggravated criminal sodomy." This instruction presented an alternative-means crime because it listed four possible criminal intents for committing the offense.

Until recently, Kansas courts used a different framework for analyzing jury instructions that contained alternative means of committing an offense. This previous framework distinguished between instances where an instruction listed "distinct alternatives for a material element of the crime," *State v. Garcia-Martinez*, 318 Kan. 681, 686, 546 P.3d 750 (2024), or merely described "'the factual circumstances in which a material element may be proven'" (or "options within a means"), *State v. Jordan*, 317

Kan. 628, 636, 537 P.3d 443 (2023). When a court's instructions included alternative means of a material element of the crime, our Supreme Court required the State to prove each alternative beyond a reasonable doubt (a requirement courts previously described as a "super-sufficiency" of the evidence). *Wright*, 290 Kan. at 203.

As this case was pending, however, the Kansas Supreme Court decided *Reynolds*, which altered this legal landscape by overruling *Wright* and its progeny and focusing on the language of K.S.A. 22-3414(3). After *Reynolds*, our analysis no longer distinguishes between alternative means and the often-perplexing "options within a means." 319 Kan. at ___, 552 P.3d at 13-14. Instead, we review challenges to district courts' instructions on alternative-means crimes under the same framework as other challenges to jury instructions. See K.S.A. 22-3414(3). Thus, "[i]f a defendant claims a jury instruction contained an alternative means error, the reviewing court must consider whether the instruction was both legally and factually appropriate." 319 Kan. ___, Syl. ¶ 4, 552 P.3d 1. If an instructional error has occurred—for example, if an instruction includes a means for which there was no evidence and was thus not factually appropriate—we evaluate whether that error was harmless or reversible under the standards articulated in *State v. Plummer*, 295 Kan. 156, 283 P.3d 202 (2012), and *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011). 319 Kan. ___, Syl. ¶ 4, 552 P.3d 1. An alternative-means instruction that was not challenged before the district court only necessitates a new trial if the instruction was clearly erroneous. 319 Kan. at ___, 552 P.3d at 13; see K.S.A. 22-3414(3).

Since *Reynolds* was decided after the parties had already submitted their appellate briefs, we requested supplemental briefing from Arreola and the State on how we should analyze the aggravated-burglary instruction under the *Reynolds* framework. Having now reviewed the parties' responses—along with their original appellate briefs—we find that the jury was properly instructed on aggravated burglary.

8

The parties acknowledge that the aggravated-burglary instruction was legally appropriate. We agree—the district court's instruction on aggravated burglary was consistent with the language of K.S.A. 2015 Supp. 21-5807(b).

The parties' positions diverge, however, on whether the aggravated-burglary instruction was factually appropriate. To prove Arreola committed the crime of aggravated burglary, the State was required to show that Arreola entered the apartment while intending to commit at least one of the offenses listed in K.S.A. 2015 Supp. 21-5807(b). See K.S.A. 21-5202(h) ("A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result."); *State v. Gutierrez*, 285 Kan. 332, Syl. ¶ 4, 172 P.3d 18 (2007). A person's intentions upon entry for purposes of aggravated burglary are rarely proven by direct evidence; instead, they "must be discerned from the circumstances" surrounding the person's actions. *State v. Larsen*, 317 Kan. 552, 560, 533 P.3d 302 (2023).

For a jury instruction to be factually appropriate, there must be some evidence—viewed "in the light most favorable to the requesting party"—that makes the instruction relevant to the facts of the case. *Reynolds*, 319 Kan. at ___, 552 P.3d at 12; *State v. Carter*, 316 Kan. 427, 430, 516 P.3d 608 (2022). Arreola concedes that there was evidence from which a jury could find that he entered the apartment with the intent to commit aggravated assault, which the court included in the instruction as an intent that could support an aggravated-burglary conviction. But he asserts that the instruction was factually overbroad and thus inappropriate because the evidence did not show that he had not entered the apartment with the specific intent to commit the other three crimes listed in the court's aggravated-burglary instruction—theft, rape, and aggravated criminal sodomy. We do not find this argument persuasive.

9

First, there was evidence presented at trial from which a jury could find that Arreola entered the apartment with the intent to commit theft. Arreola does not contest the fact that he stole several pairs of underwear and a scarf. See *State v. Colson*, 312 Kan. 739, 756, 480 P.3d 167 (2021) (noting that "the jury could have inferred an *initial* intent to break in to commit a theft" from "the intruder's ultimate post-break-in conduct").

Similarly, there was evidence submitted at trial from which a jury could find that Arreola entered the apartment with an intent to commit rape or an intent to commit aggravated criminal sodomy. Shortly after entering the apartment, Arreola forced his way into a bedroom, pulled down a woman's sweatpants, and raped and sodomized her. It is true that Arreola confronted a few people in different areas of the apartment before reaching this victim. But while Arreola was free to argue that these actions showed he did not have a specific intent to rape or sodomize when he broke into the apartment, the jury could also discern this intent from the circumstances of his entry.

Viewing the evidence in the light most favorable to the State, there was evidence presented at trial to show that Arreola entered the apartment "with the intent to commit rape, aggravated assault, theft, or aggravated criminal sodomy." Thus, the court's instruction to the jury on aggravated burglary was legally and factually appropriate. Arreola has not shown any error in the district court's aggravated-burglary instruction.

1.2. *The absence of an instruction on voluntary intoxication was not clearly erroneous.*

Arreola next asserts that the district court should have instructed the jury on the effect that his voluntary intoxication had on his ability to form the specific intent to commit aggravated burglary. Arreola did not request this instruction at trial. But he claims on appeal that the instruction was appropriate, and the absence of that instruction impaired the jury's assessment of the evidence.

The parties agree that an instruction on voluntary intoxication was legally appropriate as to the aggravated-burglary charge because this crime requires a specific criminal intent—in Arreola's case, to enter a dwelling without authority to commit rape, aggravated assault, theft, or aggravated criminal sodomy. See *State v. Murrin*, 309 Kan. 385, 393, 435 P.3d 1126 (2019) (voluntary-intoxication instruction is legally appropriate for specific-intent crimes). They disagree, however, as to whether this instruction was factually appropriate.

A jury instruction on voluntary intoxication is factually appropriate in aggravated-burglary cases when there is evidence presented at trial that could support a finding that the defendant was intoxicated to the point that their mental faculties were so impaired that they could not form the specific intent necessary to commit that crime. *State v. Crawford*, 253 Kan. 629, 642, 861 P.2d 791 (1993); see *State v. Makthepharak*, 276 Kan. 563, 572, 78 P.3d 412 (2003). Evidence that a person may have lacked this level of intent due to intoxication tends to show the "loss of the ability to reason, to plan, to recall, or to exercise motor skills." *State v. Gallegos*, 313 Kan. 262, 271, 485 P.3d 622 (2021); see also *State v. Betancourt*, 299 Kan. 131, 141, 322 P.3d 353 (2014) ("Loss of memory or inability to remember events before or during the offense may show an inability to form intent.").

Arreola argues there was evidence at trial showing he was so intoxicated that he could not form the necessary intent to commit aggravated burglary. He notes that there was ample evidence that he had been drinking alcohol that night. While he admits there was no evidence to prove how much alcohol he drank or what his blood alcohol content was, he argues that his actions and the statements he made after entering the apartment showed that he was highly intoxicated. He points out that

- one guest testified that Arreola's behavior earlier in the night was "what you would expect from a drunk person";

- Arreola acted bizarrely, giving statements that he "was FBI" and what he was doing "was just protocol"; and

- the detective testified that Arreola appeared drunk and gave nonsensical answers during his interview.

The State counters that this evidence does not show that Arreola was too intoxicated to form the necessary intent to commit aggravated burglary, asserting that Kansas courts will not infer that a defendant was so impaired that they were unable to form the necessary intent simply because they drank alcohol or were drunk. See *State v. Kidd*, 293 Kan. 591, 595, 265 P.3d 1165 (2011); see also *State v. Brown*, 291 Kan. 646, 656, 244 P.3d 267 (2011). But these cases are distinguishable from the facts here, as both cases were devoid of evidence that would call the respective defendants' intent into question. In *Kidd*, there was evidence that the defendant was only "'buzzed,'" not drunk, and that he was talking and playing video games with the victim just before the criminal events took place. 293 Kan. at 596. In *Brown*, there was evidence that although the defendant smelled of alcohol and was mumbling, his mental faculties were intact. 291 Kan. at 657.

Here, there was some evidence—albeit perhaps tenuous—supporting the instruction. While we do not find that the guests' testimony about Arreola's actions earlier in the evening or the strangeness of Arreola's "FBI" statements, in and of themselves, warrant a voluntary-intoxication instruction, the detective's testimony is another matter. The detective explained that Arreola appeared drunk during the police interview and said that Arreola claimed he did not recall anything about his actions that night. The jury could assess the credibility of Arreola's assertions based on the evidence presented. But the detective's statements show that the instruction was relevant under the facts. In other words, the voluntary-intoxication instruction was factually appropriate.

But our analysis does not end here. Because Arreola did not request a voluntary-intoxication instruction at trial, he must demonstrate that the absence of that instruction was a clear error that infected the fairness of the trial. That is, he must firmly convince this court that the jury would have reached a different verdict even if the district court had given that instruction. Arreola has not made this showing.

The jury heard evidence regarding Arreola's drinking, including the guests' and detective's testimony. But the jury also heard evidence showing that Arreola entered the apartment with a specific criminal intent and was aware of his actions. For example, after Arreola broke into the apartment, he had the wherewithal to try to control the movement of the partygoers by putting his gun to the back of a guest's neck and threatening to shoot him if he moved and by chasing several people who were running away from him. Arreola was also able to navigate his way back into the apartment after he had chased a guest into the parking lot. After Arreola had forced his way into a bedroom and was assaulting L.M., there was evidence that he remained aware of his actions—he pointed his gun at C.T. and said, "Don't fucking look at me." And when officers arrived at the apartment, Arreola stopped what he was doing, flashed his gun outside the bedroom door, and fled the scene.

We are not firmly convinced that the jury would have reached a different verdict even if the district court had given a voluntary-intoxication instruction.

2. *The prosecutor did not misstate the law when discussing the reasonable-doubt standard.*

Arreola also challenges the fairness of his trial based on the prosecutor's closing argument. He asserts that the prosecutor misled the jury by inaccurately describing the State's burden to prove the elements of all offenses beyond a reasonable doubt. Again, we are not persuaded by Arreola's argument.

Appellate courts use a two-step process to review claims of prosecutorial error. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). We first determine whether the prosecutor erred by making arguments that fell "outside the wide latitude afforded" to attorneys arguing their cases. 305 Kan. at 109. In doing so, we consider the context in which the challenged statement was made, rather than analyzing the statement in isolation. *State v. Bodine*, 313 Kan. 378, 406-07, 486 P.3d 551 (2021). If we find the prosecutor erred, then the State must convince us beyond a reasonable doubt that the erroneous argument did not affect the jury's verdict. *Sherman*, 305 Kan. at 98, 109.

Our discussion of Arreola's claim requires additional background. Arreola's closing argument at trial focused on what he perceived as holes in the State's evidence and why the absence of some evidence created doubt as to his guilt. For example, Arreola noted that an officer had apprehended a different person within blocks of the apartment the night of the incident, but that officer did not testify at trial. Arreola also pointed to the absence of seminal DNA evidence, arguing that the State should have conducted a more thorough investigation.

The prosecutor's rebuttal addressed these arguments, explaining that the absence of some evidence did not necessarily mean that the State had not met its burden of proof. For context, we provide a lengthy passage from that discussion here:

> "[A]t the end of the day, when you're back there deliberating, you might want more. It's natural to want that. . . . And you might want to see that, but that doesn't mean you don't have enough, because the last thing I need to talk to you guys about today is the idea of reasonable doubt.
> "Now, in a criminal case, it is the State's burden of proof. The defendant is not required to prove that he is innocent. The State must prove that he's guilty. Well, we have done that in this case. And one thing to keep in mind about the burden of proof is, although it is a heavy burden, it is not an impossible burden. We do not have a criminal

justice system that has created for itself a burden of proof that is like a mountain so high that it can never be climbed.

"If you had any reasonable doubt as to the defendant's guilt, that's one thing, but you should ask yourself this question about whether any of the doubts that [defense counsel] has presented to you are, in fact, reasonable, because the bottom line is, although the defendant does not have to prove that he is not guilty, he also doesn't have to just sit here and watch the State present its case. He can present his own case, as he has done. He can present his own evidence. He can cross-examine the State's witnesses.

"And it is an entirely fair question to ask at the end of the trial if the defendant's arguments are weak, if his claims don't consent or they don't seem to be credible or believable, then there should not be any reasonable doubt as to the defendant's guilt."

Arreola argues that this line of argument attempted to shift the State's burden of proof to him by insinuating that he must present evidence of his innocence. We disagree.

In a criminal case, the State must prove each element of the charged crimes beyond a reasonable doubt. *Miller v. State*, 298 Kan. 921, Syl. ¶ 5, 318 P.3d 155 (2014). Prosecutors may not misstate the law or attempt to shift the burden of proof to the defendant. *State v. Pribble*, 304 Kan. 824, 837, 375 P.3d 966 (2016). But this does not mean that prosecutors are animatrons. They are attorneys advocating for the State's position. They may argue that some evidence is more credible than other evidence and may use the art of rhetoric—within the confines of reason and the governing law—to convey the strength of the State's case to the jury.

To this end, prosecutors are granted "'considerable latitude to address the weaknesses of the defense.'" 304 Kan. at 837. They may point out a lack of evidence supporting a defendant's argument. *State v. Hachmeister*, 311 Kan. 504, 516, 464 P.3d 947 (2020). And, relevant here, when a defendant argues that the State's evidence is not credible because the State failed to present some piece of evidence, the prosecutor may respond by "'informing the jury that the defense has the power to introduce evidence'" and subpoena witnesses. 311 Kan. at 516.

15

The prosecutor's arguments, when viewed in context, discuss the contours of the reasonable-doubt standard in a manner consistent with Kansas law. The prosecutor emphasized that the State bore the burden to prove Arreola's guilt. The prosecutor's remark that "although the defendant does not have to prove he is not guilty, he also doesn't have to just sit here and watch the State present its case" did not shift the burden of proof to Arreola. A prosecutor can properly point out a lack of evidence supporting a defendant's argument. *Pribble*, 304 Kan. at 837 ("[A] prosecutor does not shift the burden of proof by pointing out the absence of evidence to support the defense argument that there are holes in the State's case.").

We are similarly unconvinced by Arreola's claim that a later statement by the prosecutor regarding Arreola's subpoena power also attempted to shirk the State's burden. When addressing the defense's assertions during closing argument about the absence of certain types of evidence, the prosecutor observed that "the defendant has the same power of subpoena that the State has." The prosecutor continued: "[I]f the defendant thought that there was a witness or a piece of evidence that would show a reasonable doubt to you as jurors, he could have subpoenaed the witness to come in and testify, or he could have admitted the evidence himself." This argument was a permissible effort to rebut the defense's assertion.

Arreola has not shown that the prosecutor's closing argument went beyond the permissible latitude allowed to an advocate arguing their case. We are unpersuaded by his claims of prosecutorial error.

3. *Arreola has not shown a constitutional infirmity in the intent elements of the statutes defining rape and aggravated criminal sodomy.*

Arreola also challenges the constitutionality of the statutes defining rape and aggravated criminal sodomy. Arreola argues that these statutes violate his right to due

process of law because the 2010 recodification of the Kansas criminal code added language that "it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the [sexual act], that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless," essentially making rape and aggravated criminal sodomy strict-liability offenses. See K.S.A. 2015 Supp. 21-5503(e) (rape); K.S.A. 2015 Supp. 21-5504(f) (aggravated criminal sodomy).

Arreola concedes that he did not raise this challenge before the district court. But he argues—and we agree—that the record permits us to meaningfully consider his constitutional claim because it is a purely legal question that turns solely on the language of K.S.A. 2015 Supp. 21-5503(e) and K.S.A. 2015 Supp. 21-5504(f). And even if the district court had considered this question before or after trial, we would not be constrained by the district court's statutory interpretation. *State v. Harris*, 311 Kan. 816, 821, 467 P.3d 504 (2020).

As Arreola acknowledges, the Kansas Supreme Court recently rejected this same constitutional challenge to the rape statute in *State v. Thomas*, 313 Kan. 660, 488 P.3d 517 (2021). In *Thomas*, the court found that even if rape and aggravated criminal sodomy lacked an intent requirement, "nothing in our law suggest[s] due process prohibits the Legislature from adopting strict liability criminal offenses." 313 Kan. at 663.

Arreola asserts that *Thomas* was wrongly decided. But as an intermediate appellate court, we have a duty to follow the controlling precedent of the Kansas Supreme Court absent some indication the court is departing from its previous position. *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 168, 298 P.3d 1120 (2013). Our Supreme Court has not signaled an intention to depart from its relatively recent analysis in *Thomas*. Nor has Arreola articulated why *Thomas*' reasoning, which was based on the statutory definition of rape, is not equally applicable to aggravated criminal sodomy.

Arreola has not shown that K.S.A. 2015 Supp. 21-5503(e) or K.S.A. 2015 Supp. 21-5504(f) are facially unconstitutional.

4.  *No errors accumulated to deny Arreola a fair trial.*

In his remaining argument, Arreola asserts that even if his claimed errors did not individually require reversal of his convictions, their combination deprived him of a fair trial. But beyond the absence of a voluntary-intoxication instruction—which is subject to a clear-error review and not included in a cumulative-error analysis—Arreola has not apprised us of any error, let alone multiple errors that compound to undermine the fairness of his trial. See *State v. Waldschmidt*, 318 Kan. 633, Syl. ¶ 9, 546 P.3d 716 (2024); *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009).

No trial is perfect. But a defendant is entitled to a fair trial, not a perfect one. *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013). After carefully reviewing the record, we find that Arreola received a fair trial under the law, and we affirm his convictions.

Affirmed.